E-FILED
Monday, 18 July, 2011  05:33:35 PM
Clerk, U.S. District Court, ILCD

### UNITED STATES DISTRICT COURT
### FOR THE CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

OAK LEAF OUTDOORS, INC.
an Illinois corporation,

        Plaintiff,

        vs.

DOUBLE DRAGON
INTERNATIONAL, INC., an Iowa
corporation, d/b/a DDI, INC.,

        Defendant.

No. 1:11-cv-01175-MMM-JAG

**Defendant Double Dragon International Inc.'s Memorandum of Law
in Support of Its Motion for a Preliminary Injunction**

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
Christopher W. Madel (MN Reg. No. 230297)
Barry M. Landy (MN Reg. No. 391307)
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402-2015

JOHNSON & BELL LTD.
H. Patrick Morris (IL State Bar No. 6187083)
33 West Monroe St., Suite 2700
Chicago, IL 60603-5404

*Attorneys for Defendant*
*Double Dragon International, Inc.*

82295648.2

# TABLE OF CONTENTS

**Page**

Introduction..................................................................................................1

Facts ............................................................................................................2

I.      In June 2009, DDI and Oak Leaf Entered into Contractual Negotiations ............................................................................................2

II.      DDI Advanced Oak Leaf Money Because Oak Leaf Could Not, and Cannot, Pay Its Debts as they Become Due .......................................3

III.      Oak Leaf Approved Samples of Products Created by the Manufacturers and Submitted a Purchase Order.............................................4

IV.      The Manufacturers Begin Shipping the Product, Oak Leaf Accepts the Goods and Submits an Additional Purchase Order .................................6

V.      Oak Leaf Has Failed to Pay DDI for Ordered Goods And Still Owes DDI Approximately $1.8 Million ........................................................7

VI.      Oak Leaf is Unable to Pay its Debts as they Come Due ...................8

VII.      DDI Counterclaims Oak Leaf for Breach of Contract, Promissory Estoppel, Unjust Enrichment, and Injunctive Relief .........................................9

Argument.....................................................................................................10

I.      DDI Will Suffer Irreparable Harm Because Oak Leaf is Insolvent .............11

II.      DDI Is Likely to Succeed on the Merits of its Counterclaims ......................14

     A.      DDI is likely to succeed on its breach of contract claim ....................14

         1.      DDI and Oak Leaf had a valid contract and Oak Leaf accepted the goods ........................................................................15

         2.      Oak Leaf did not effectively reject the goods...........................16

i

   3. Oak Leaf did not revoke its acceptance of the goods...............19

  B. DDI is likely to succeed on its promissory-estoppel claim ...............21

  C. DDI is likely to succeed on its unjust enrichment claim....................22

  D. Oak Leaf is unlikely to succeed on its breach of express warranty claim.......................................................................................23

  E. Oak Leaf is unlikely to succeed on its breach of implied warranty claim based on merchantability of goods..........................25

  F. Oak Leaf is unlikely to succeed on its breach of implied warranty claim based on fitness for a particular purpose .................27

III. The Balance of Equities Favors DDI .................................................28

IV. The Public Interest Supports Granting This Preliminary Injunction...........29

V The Court Should Order No More Than a Nominal Bond ...........................30

Conclusion .............................................................................................................31

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Am. Hosp. Supply Corp. v. Hosp. Prod. Ltd.*,
  780 F.2d 589 (7th Cir. 1986) ............................................................. 10, 11, 28, 29

*Anthony v. Country Life Mfg., L.L.C.*,
  No. 02 C 1601, 2002 U.S. Dist. LEXIS 19445 (N.D. Ill. Oct. 9, 2002) .............. 17

*Athey Prods. Corp. v. Harris Bank Roselle*,
  901 F. Supp. 1355 (N.D. Ill. 1995) ..................................................................... 12

*Berg v. Teamsters*,
  No. 10 C 5334, 2010 U.S. Dist. LEXIS 93891 (N.D. Ill. Sep. 9, 2010) .............. 30

*Charles v. Judge & Dolph, Ltd.*,
  263 F.2d 864 (7th Cir. 1959) .............................................................................. 24

*Com. Of Pa. v. Mid-Atlantic Toyota Distrib*,
  704 F.2d 125 (4th Cir. 1983) .............................................................................. 29

*Cooper v. Salazar*,
  196 F.3d 809 (7th Cir. 1999) .............................................................................. 14

*Cunard S.S. Co. v. Salen Reefer Servs. AB*,
  773 F.2d 452 (2d Cir. 1985) ............................................................................... 29

*Deckert v. Independence Shares Corp.*,
  311 U.S. 282 (1940) ........................................................................................... 10

*Econ. Folding Box Corp. v. Anchor Frozen Foods, Corp.*,
  No. 04 CV 4485, 2007 U.S. Dist. LEXIS 19603 (N.D. Ill. Mar. 27, 2007) ........ 27

*Fabrica De Tejidos Imperial, S.A. v. Brandon Apparel Grp.*,
  218 F. Supp. 2d 974 (N.D. Ill. 2002) ..................................................... 15, 16, 17

iii

*Global Tech. & Trading, Inc. v. Satyam Computer Servs.,*
No. 09 CV 5111, 2011 U.S. Dist. LEXIS 8292 (N.D. Ill. Jan. 28, 2011)...........23

*Greenwich Indus., L.P. v. Leggett & Platt, Inc.,*
No. 07 C 6550, 2009 U.S. Dist. LEXIS 49478 (N.D. Ill. June 11, 2009) ..........20

*In re Better Care, Ltd.,*
97 B.R. 405 (Bankr. N.D. Ill. 1989).......................................................12

*Lesnefsky v. Fischer & Porter Co.,*
527 F. Supp. 951 (E.D. Pa. 1981) .........................................................26

*Lorenzo Banfi Di Banfi Renzo & Co. v. Davis Congress Shops, Inc.,*
568 F. Supp. 432 (N.D. Ill. 1983) .........................................................17

*MacSteel Int'l USA Corp. v. Superior Prods. Co., Inc.,*
Case No. 98-C-7182, 2002 U.S. Dist. LEXIS 5573 (N.D. Ill. Mar. 27,
2002) ..........................................................................................17

*Midwest Generation, LLC v. Carbon Processing & Reclamation, LLC,*
445 F. Supp. 2d 928 (N.D. Ill. 2006) ....................................................15

*Pace Am., Inc. v. Elixir Indus.,*
No. 06 C 4661, 2009 U.S. Dist. LEXIS 6281 (N.D. Ill. Jan. 27, 2009)..............18

*Pearson Bros. Co. v. Pearson,*
113 B.R. 469 (C.D. Ill. 1990)..............................................................21

*Quaker Alloy Casting Co. v. Gulfco Indus., Inc.,*
686 F. Supp. 1319 (N.D. Ill. 1988) .......................................................26

*S.A.M. Elecs. v. Osaraprasop,*
39 F. Supp. 2d 1074 (N.D. Ill. 1999) ....................................................20

*SEC v. Householder,*
No. 02 C 4128, 2002 U.S. Dist. LEXIS 18810 (N.D. Ill. Oct. 1, 2002) .............10

*Steadfast Ins. Co., Inc. v. Auto Mktg. Network, Inc.,*
No. 97 C 5696, 1998 U.S. Dist. LEXIS 20286 (N.D. Ill. Dec. 22, 1998) ..........11

*Trans-Aire Int'l, Inc. v. N. Adhesive Co.,*
No. 83 C 7003, 1988 U.S. Dist. LEXIS 630 (N.D. Ill. Jan. 26, 1988)................24

iv

**Statutes**

810 ILCS 5/1-201(23)(b) ......................................................................................12

810 ILCS 5/1-205 ...............................................................................................17

810 ILCS 5/2-106 ...............................................................................................15

810 ILCS 5/2-301 ...............................................................................................15

810 ILCS 5/2-313 ...............................................................................................23

810 ILCS 5/2-313(a) ...........................................................................................23

810 ILCS 5/2-314 ...............................................................................................25

810 ILCS 5/2-315 ...............................................................................................27

810 ILCS 5/2-508 ...............................................................................................17

810 ILCS 5/2-601 ...............................................................................................16

810 ILCS 5/2-602(1) ...........................................................................................17

810 ILCS 5/2-606 ...............................................................................................15

810 ILCS 5/2-607 ...............................................................................................15

810 ILCS 5/2-607(2) ...........................................................................................20

810 ILCS 5/2-608(2) ...........................................................................................20

Fed. R. Civ. P. 65(c) ...........................................................................................30

82295648.2

## Introduction

Oak Leaf Outdoors, Inc. ("Oak Leaf") purchased approximately $2.3 million in deer hunting tree stands, blinds, and related accessories from Double Dragon International, Inc. ("DDI") pursuant to two purchase orders. Oak Leaf accepted the conforming goods delivered by DDI without complaint. Then, over six months after first receiving the products *and* after submitting an additional purchase order to DDI, Oak Leaf ceased payments on the approximately $1.8 million it owed to DDI and manufactured an allegation that the goods were non-conforming. DDI repossessed approximately $1 million in goods, but Oak Leaf and its customers retained approximately $806,000 in unpaid products.

Oak Leaf sued DDI in April 2010, and DDI counterclaimed for breach of contract, promissory-estoppel, and unjust enrichment for the unpaid balance of Oak Leaf's purchase orders. While DDI is likely to succeed on the merits at the conclusion of this suit, DDI fears that result could be nothing more than a moral victory as Oak Leaf is insolvent under the Illinois Commercial Code and will be unable to pay its judgment. DDI requests that this Court protect it from this future, irreparable harm by granting a preliminary injunction to create a constructive trust or escrow for the amount of DDI's counterclaims or, in the alternative, enter an order restricting Oak Leaf from transferring funds before the conclusion of this suit.

**Facts**

## I.     In June 2009, DDI and Oak Leaf Entered into Contractual Negotiations.

Oak Leaf sells cast aluminum deer hunting tree stands, blinds, and related accessories under the brand names "Lone Wolf Portable Tree Stand" and "CamoFlex." (Counterclaim ¶ 2, Dkt. No. 15.) DDI administers the subcontracting of manufacturers to create products in China. (*Id.* ¶ 1.) In June 2009, DDI and Oak Leaf first discussed the idea that manufacturers located in China with whom DDI has a contractual relationship (the "Manufacturers")[1] could produce cast aluminum deer hunting tree stands, blinds, and related accessories for Oak Leaf. (*Id.* ¶¶ 10, 12; Decl. of J.B. Priest ¶ 3, Ex. A (hereinafter "Priest Decl.").) To evaluate whether the business arrangement between Oak Leaf and DDI would be beneficial to both parties, Oak Leaf sent samples of its Lone Wolf Portable Tree Stand product and related accessories to DDI and the Manufacturers. (Counterclaim ¶¶ 14-16; Priest Decl. ¶ 4, Ex. B.)

After working diligently to analyze the manufacturing of Oak Leaf's products, DDI sent Oak Leaf a letter in September 2009 outlining the general terms of the agreement. (Priest Decl. ¶ 5, Ex. C.) DDI also requested that Oak Leaf submit "tooling," the mold used to manufacture products, to DDI and the

---

[1] DDI does not own the China manufacturers that it worked with to create Oak Leaf's cast aluminum deer hunting tree stands, blinds, and related accessories. Rather, DDI contracted with the China manufacturers to create these products for Oak Leaf.

Manufacturers because DDI had not previously manufactured the requested products. (Counterclaim ¶¶ 16, 18, 19; Priest Decl. ¶ 5, Ex. C.) In the September 2009 letter, DDI outlined its philosophy of focusing on customer satisfaction by providing buyers with several opportunities to approve goods before their final shipment. (Priest Decl. ¶ 5, Ex. C.)

## II. DDI Advanced Oak Leaf Money Because Oak Leaf Could Not, and Cannot, Pay Its Debts as They Become Due.

In October 2009, DDI sent an invoice to Oak Leaf for $28,978, the amount of the tooling set-up fees as well as the cost to ship the tooling to China, due within 30 days of receipt. (Counterclaim ¶¶ 21-22; Priest Decl. ¶ 6, Ex. D.) Oak Leaf lacked the funds necessary to pay DDI for the tooling set-up fees and shipping costs and requested that DDI modify the payment schedule for the amount owed on the October 2009 invoice. (Counterclaim ¶ 24; Priest Decl. ¶ 7, Ex. E (Email from Account Executive at DDI explaining that Oak Leaf was "having some issues with their current suppliers").)

To accommodate Oak Leaf, DDI sent a revised invoice on October 22, 2009 allowing Oak Leaf to pay 50% upon receipt and amortize the other 50% over the first year of production. (Counterclaim ¶ 27; Priest Decl. ¶ 8, Ex. F.) By structuring Oak Leaf's payments in this manner, DDI was able to receive the

3

tooling and have the Manufacturers begin production while giving Oak Leaf time to remedy its lack of funds. (Priest Decl. ¶ 9.)

### III.  Oak Leaf Approved Samples of Products Created by the Manufacturers and Submitted a Purchase Order.

Oak Leaf gave the tooling to DDI, who in turn gave it to the Manufacturers to make product samples. (Counterclaim ¶¶ 33-34; Priest Decl. ¶¶ 10-11, Exs. G-I.) After the Manufacturers started to produce samples of the product, Oak Leaf employees sent emails to DDI approving the design and production. (Priest Decl. ¶ 13, Ex. K (email from Oak Leaf employee approving certain samples products); Ex. L (email from Oak Leaf employee approving blinds subject to certain specifications); Ex. M (email from Oak Leaf employee stating that the "quality of the parts we've seen have been good").)

Oak Leaf's executives subsequently traveled on two separate occasions to China in March and April 2010 to approve samples of the products. (Counterclaim ¶¶ 36, 42.) Oak Leaf employees requested minor changes to the products such as changing aspects of the logo and adding a small plastic hook, but approved the overall production. (Counterclaim ¶¶ 36-37, 42-43; Priest Decl. ¶ 14, Ex. N (email from Oak Leaf employee stating that the products look good).) In accordance with DDI's customer service philosophy, DDI made all changes requested by the Oak Leaf executives. (Counterclaim ¶¶ 39-41, 44-46.) DDI also

4

continued to provide updated samples to Oak Leaf, all of which were approved by Oak Leaf executives. (*Id*.)

In April 2010, the Manufacturers shipped completed samples of the Lone Wolf Portable Tree Stands, CamoFlex blinds, and related accessories to DDI. (Counterclaim ¶ 45; Priest Decl. ¶ 15, Ex. O.) DDI sent the samples to Oak Leaf. (Counterclaim ¶ 45.) After receiving the completed product samples, Oak Leaf provided DDI with a Purchase Order dated April 30, 2010 requesting that DDI manufacture Lone Wolf Portable Tree Stands, CamoFlex blinds, and related accessories for approximately $1.3 million. (Priest Decl. ¶ 16, Ex. P.) Oak Leaf only specified that the manufactured products must pass Treestand Manufacturing Association (TMA) standards. (*Id*.)

After receiving the Purchase Order, DDI worked with the Manufacturers to start production of goods immediately. (*See* Priest Decl. ¶ 17.) In May 2010, Oak Leaf sent samples of the tree stands for TMA testing to the Scientific Testing Group. (*Id*.) All of the products passed TMA guidelines with the exception of a tree rope and climbing rope used in conjunction with a safety harness. (Counterclaim ¶ 53; Priest Decl. ¶ 17, Exs. Q, R (emails from Oak Leaf employee outlining the products that "passed all tests" and discussing problems with the ropes).) To achieve full compliance with Oak Leaf's condition that all products pass TMA standards, DDI agreed to use one of Oak Leaf's domestic suppliers to

5

create the tree and climbing ropes used in the safety harness system.

(Counterclaim ¶ 53.) Oak Leaf agreed. (*Id*.)

## IV.   The Manufacturers Begin Shipping the Product, Oak Leaf Accepts the Goods and Submits an Additional Purchase Order.

The Manufacturers sent Oak Leaf completed tree stands, blinds, and related accessories from June 2010 to December 2010. (Counterclaim ¶¶ 54-55; Priest Decl. ¶ 27, Ex. Y.) Oak Leaf accepted the goods. (Counterclaim ¶ 56.) During this period, Oak Leaf contacted DDI on a weekly basis requesting that DDI speed the production of remaining goods. (Counterclaim ¶ 57; Priest Decl. ¶ 30, Exs. Z, AA, BB, CC, DD (emails from Oak Leaf employees requesting expedited shipments of product for cash flow reasons).)

Oak Leaf inspected each product that DDI shipped. DDI knows that such an inspection occurred because Oak Leaf employees were required to insert a safety harness into the box and DDI employees viewed Oak Leaf employees inspecting the goods before selling them to customers. (Priest Decl. ¶ 18.)

In September 2010—three months after the first shipment of the goods and after inspecting the delivered goods—Oak Leaf sent DDI a second Purchase Order, requesting that DDI produce additional Lone Wolf Portable Tree Stands and CamoFlex products for approximately $252,000. (Counterclaim ¶ 58; Priest Decl. ¶ 19, Ex. S.) Oak Leaf also agreed to continue its manufacturing

6

relationship with DDI during the 2011 sales year. (Counterclaim ¶¶ 59-61; Priest

Decl. ¶ 21, Ex. U.)

**V.      Oak Leaf Has Failed to Pay DDI for Ordered Goods And Still Owes DDI Approximately $1.8 Million.**

In total, Oak Leaf requested approximately $2.3 million of Lone Wolf

Portable Tree Stands, CamoFlex blinds, and related accessories from April 2010

to December 2010. (Counterclaim ¶ 62; Priest Decl. ¶ 27, Ex. Y.) Oak Leaf paid

DDI approximately $575,000 between September and October 2010.

(Counterclaim ¶ 63.) In late November 2010, Oak Leaf ceased making payments,

forcing DDI to repossess approximately $500,000 of goods from Oak Leaf and

divert the remaining shipments of approximately $400,000 of goods to DDI's

warehouses until Oak Leaf paid for the goods. (Counterclaim ¶¶ 64-65.) Oak

Leaf still owes approximately $1.8 million to DDI, including approximately

$806,000 for products that Oak Leaf maintains in its possession or that were sold

to Oak Leaf's customers. (Counterclaim ¶¶ 66-68; Priest Decl. ¶ 31, Ex. EE.)

After it became clear that Oak Leaf did not plan to fulfill its contractual

obligations, DDI provided notice to Oak Leaf that it intended to mitigate its

damages and sell the products that had been diverted to DDI's warehouse.

(Priest Decl. ¶ 33, Ex. GG.)

7

Upon notifying Oak Leaf of this intention, DDI received a letter from Oak Leaf objecting to the sale or distribution of the goods because, among other reasons, the goods bear a "protected trademark." (Priest Decl. ¶ 34, Ex. HH.) Oak Leaf also threatened to "proceed immediately to attempt to secure an injunction" if DDI sold the goods. (*Id.*) Because of Oak Leaf's threats, DDI maintains approximately $1 million worth of goods in its Dubuque, Iowa warehouse that Oak Leaf refuses to pay for or allow DDI to resell.

## VI.    Oak Leaf is Unable to Pay its Debts as they Come Due.

DDI is not the only vendor that Oak Leaf has been unable to pay. Between July 2009 and July 2010, Oak Leaf was unable to pay some of its vendors, necessitating that DDI provide Oak Leaf approximately $84,091.12 in order to keep Oak Leaf solvent. (Priest Decl. ¶ 22, Ex. V.) Moreover, DDI directly paid Oak Leaf's vendors for necessary component parts for Oak Leaf products totaling approximately $54,575.02. (*Id.*) Oak Leaf's failure to pay debts also resulted in pending litigation against Oak Leaf in a Washington court, alleging that Oak Leaf failed to pay debts to Omega Pacific. (Priest Decl. ¶ 23, Ex. X.)

DDI has also learned that Oak Leaf has exhibited monetary problems within the company. Oak Leaf decreased the salaries of two employees, including Michael Walston, Oak Leaf's former Chief Operating Officer. (*Id.* ¶ 24,

8

Pullen Decl. ¶ 3.) In several meetings, Oak Leaf told DDI that it needed products

to gain revenue because of outstanding obligations. (Priest Decl. ¶ 25; Pullen

Decl. ¶ 4.) DDI also believes that Oak Leaf had very few products, other than

those manufactured by DDI, to sell in the 2010 sales year and that Oak Leaf's

sales for the past year were low and did not cover its expenses. (Priest Decl. ¶ 26;

Pullen Decl. ¶ 5.)


**VII.   DDI Counterclaims Oak Leaf for Breach of Contract, Promissory Estoppel, Unjust Enrichment, and Injunctive Relief.**

On December 13, 2010—six months after receiving the first shipment of

goods and two months after submitting the second purchase order—Oak Leaf's

counsel sent DDI "formal written notification of rejection of the goods and/or

revocation of acceptance to the extent any acceptance has been made."

(Counterclaim ¶¶ 69-71; Priest Decl. ¶ 32, Ex. FF.)

In its December 2010 letter, Oak Leaf attached as Exhibit A "an itemization

of the inventory of defective/nonconforming goods" and as Exhibit B "a

summary and particularization of the nature of the nonconformity by product."

(Priest Decl. ¶ 32, Ex. FF.) This letter came six months after DDI's first shipment

of goods, six months after Oak Leaf had an opportunity to inspect the goods, and

three months after Oak Leaf ordered additional products from DDI. (*Id.* ¶¶ 18,

19, 27.) Moreover, Oak Leaf's alleged rejection or revocation of the goods did not

9

provide an itemized description of when Oak Leaf had received the allegedly defective goods. (*Id.* ¶ 32, Ex. FF.)

Oak Leaf sued DDI in the Tenth Judicial Circuit Court of Peoria County alleging breach of express and implied warranties. (Dkt. No. 1.) DDI removed the case to this Court and filed counterclaims against Oak Leaf for breach of contract, unjust enrichment, promissory-estoppel, and injunctive relief for Oak Leaf's refusal to pay for the goods it accepted. (Dkt. No. 15.) Oak Leaf failed to answer DDI's counterclaims, and concurrently with this motion, DDI has moved for a default judgment.

## Argument

A preliminary injunction is appropriate where "the remedy available at the end of trial will not make the plaintiff whole." *Am. Hosp. Supply Corp. v. Hosp. Prod. Ltd.*, 780 F.2d 589, 594 (7th Cir. 1986). If a business is insolvent, courts may grant preliminary injunctions to create a constructive trust, escrow, or freeze the defendant's assets to preserve funds necessary to provide an adequate remedy at trial. *See, e.g., SEC v. Householder*, No. 02 C 4128, 2002 U.S. Dist. LEXIS 18810, at *8 (N.D. Ill. Oct. 1, 2002) (granting a preliminary injunction to freeze the defendants' assets until resolution of the claims); *see also Deckert v. Independence Shares Corp.*, 311 U.S. 282, 290 (1940) (holding that a preliminary injunction to freeze assets is appropriate when it is shown that the defendant is likely to be insolvent at the

10

time of judgment).

When evaluating a preliminary injunction motion, courts determine:
(1) the threat of irreparable harm to the movant if the preliminary injunction is
denied; (2) the likelihood of the movant's ultimate success on the merits; (3) the
balance between that harm and the harm that the preliminary injunction would
cause other litigants; and (4) the public interest. *Am. Hosp. Supply Corp.*, 780 F.2d
at 593-94. In this case, all four factors favor granting to DDI a preliminary
injunction to create a constructive trust or escrow for the amount of DDI's
counterclaims or, in the alternative, entering an order restricting Oak Leaf from
transferring funds before the conclusion of this suit.

## I.    DDI Will Suffer Irreparable Harm Because Oak Leaf is Insolvent.

Irreparable harm will result when DDI is unable to collect its judgment
against Oak Leaf because Oak Leaf is insolvent. Monetary injury is an irreparable
harm if a defendant's insolvency will hinder the plaintiff's ability to collect
damages after a final judgment. *See, e.g.*, *Am. Hosp. Supply Corp.*, 780 F.2d at 596
(noting that "a defendant's [potential or actual] insolvency is a standard ground"
for granting a preliminary injunction); *Steadfast Ins. Co., Inc. v. Auto Mktg.
Network, Inc.*, No. 97 C 5696, 1998 U.S. Dist. LEXIS 20286, at *36-37 (N.D. Ill. Dec.
22, 1998) ("[W]here the moving party shows that there is the possibility of an
unsatisfied money judgment . . . [the] irreparable injury requirements are

satisfied."). Under the Illinois Commercial Code, a company is insolvent when it cannot pay its debts as they become due. 810 ILCS 5/1-201(23)(b); *Athey Prods. Corp. v. Harris Bank Roselle*, 901 F. Supp. 1355, 1358 (N.D. Ill. 1995); *see also In re Better Care, Ltd.*, 97 B.R. 405, 406 (Bankr. N.D. Ill. 1989) (noting that the equity test for insolvency is when a "debtor is generally not paying such debtor's debts as such debts become due") (internal citations omitted).

Oak Leaf is insolvent under the Illinois Commercial Code or any other insolvency definition. Oak Leaf has been unable to consistently pay DDI or its other vendors since July 2009. DDI provided Oak Leaf approximately $84,091.12 to pay its debts and keep the company solvent. Moreover, between July 2009 and July 2010, DDI directly paid Oak Leaf's vendors for necessary component parts totaling $54,575.02. Additionally, in October 2009, DDI restructured Oak Leaf's payment plan for the tooling set-up fees because Oak Leaf was unable to pay the full amount due and owing.

Oak Leaf has failed to pay other current debts. Pending litigation against Oak Leaf in a Washington court alleges that Oak Leaf failed to pay its debts to Omega Pacific, Inc. ("Omega"), another of Oak Leaf's vendors. The complaint in the Washington suit alleges that Oak Leaf still owes Omega approximately $31,605.25 for failure to make payments under its purchase order for goods.

12

Oak Leaf also has internal monetary problems. In several meetings, Oak Leaf told DDI that it needed products to gain revenue because of outstanding obligations. Oak Leaf repeatedly asked DDI to speed the production and shipment of the goods so that it could sell the products for much needed revenue. DDI also believes that Oak Leaf had very few products, other than those manufactured by DDI, to sell in the 2010 sales year and that Oak Leaf's sales for the past year were low. Additionally, Oak Leaf cut two of its employees' salaries, including its Chief Operations Officer, demonstrating Oak Leaf's dire financial condition.

Given the totality of these facts, Oak Leaf is insolvent under the Illinois Commercial Code. Moreover, Oak Leaf is compounding the potential effect of its insolvency on DDI by refusing to allow DDI to sell the goods that it diverted from Oak Leaf's possession. Oak Leaf has objected to DDI's sale or distribution of the goods because, among other reasons, the goods bear a "protected trademark." Because of Oak Leaf's threats, DDI maintains approximately $1 million worth of goods in its Dubuque, Iowa warehouse that Oak Leaf refuses to purchase or to allow DDI to resell. Therefore, not only is Oak Leaf effectively insolvent, it is also taking affirmative actions to foreclose DDI's ability to collect any money off products that were specifically produced for Oak Leaf. Without the creation of a constructive trust, escrow, or an order freezing Oak Leaf's

13

assets, Oak Leaf's insolvency will foreclose DDI's ability to collect damages from Oak Leaf at the conclusion of the present litigation, causing DDI an irreparable injury.

**II.    DDI Is Likely to Succeed on the Merits of its Counterclaims.**

DDI is likely to succeed on the merits of its counterclaims, which is the second factor for a preliminary injunction. To sufficiently prove this element of the analysis, the plaintiff only must show a "better than negligible chance of succeeding" on the merits. *Cooper v. Salazar*, 196 F.3d 809, 813 (7th Cir. 1999) (internal citations omitted). DDI will easily exceed this standard on its breach of contract, unjust enrichment, and promissory-estoppel counterclaims and can also prove that Oak Leaf is unlikely to succeed on its breach of express and implied warranty claims.

**A.    DDI is likely to succeed on its breach of contract claim.**

Oak Leaf breached its contract with DDI when Oak Leaf accepted goods from DDI and ceased making payments without validly rejecting the goods or revoking acceptance.

1. **DDI and Oak Leaf had a valid contract and Oak Leaf accepted the goods.**

Under the Illinois Commercial Code, a contract requires the seller to deliver conforming goods and the buyer to pay the contract rate for the goods. 810 ILCS 5/2-301; 810 ILCS 5/2-106; 810 ILCS 5/2-607. Acceptance occurs when the buyer notifies the seller that it has accepted the goods, fails to make an effective rejection after a reasonable opportunity to inspect the goods, or acts as though the buyer has accepted the goods. 810 ILCS 5/2-606.

The sale of the goods to a third party evidences that the buyer has accepted goods. *Midwest Generation, LLC v. Carbon Processing & Reclamation*, *LLC*, 445 F. Supp. 2d 928, 933 (N.D. Ill. 2006). Upon acceptance, "the buyer is liable to the seller for the full contract price, regardless of whether or not the goods were conforming." *Fabrica De Tejidos Imperial, S.A. v. Brandon Apparel Grp.*, 218 F. Supp. 2d 974, 978 (N.D. Ill. 2002).

The parties do not dispute that a contract existed between Oak Leaf and DDI—DDI was required to work with the Manufacturers to create cast aluminum deer hunting tree stands, blinds, and related accessories in exchange for payment. (Complaint ¶ 4, Dkt. No. 1.) DDI properly delivered conforming goods, after providing Oak Leaf with samples and incorporating all changes requested by Oak Leaf into the final products. Oak Leaf's employees sent repeated emails to DDI approving the design and production, assuring DDI that

15

the "quality of the parts we've seen have been good." (Priest Decl. ¶ 13, Ex. M.)

Oak Leaf executives even travelled to China on two occasions to approve

samples of the products. (Counterclaim ¶¶ 36, 42.)

Oak Leaf also inspected items shipped by DDI before selling them to

customers. (Priest Decl. ¶ 18.) Oak Leaf opened each individual product to

include a safety harness before the products were sold. (*Id.*) DDI employees

visited Oak Leaf's facility and viewed Oak Leaf employees taking the products

out of the box to inspect them. (*Id.*) Oak Leaf accepted the goods because it

approved numerous samples and sold over $1.3 million in product to customers

after inspection without providing any notice of rejection to DDI.


### 2.  Oak Leaf did not effectively reject the goods.

While the Illinois Commercial Code allows a buyer to reject goods and

cease performance of its obligations, Oak Leaf made no such rejection. If the

goods are non-conforming, the Illinois Commercial Code allows a buyer to

(a) reject in whole, (b) accept in whole, or (c) accept any commercial unit or units

and reject the rest. 810 ILCS 5/2-601.

To reject goods, the buyer must put the seller on notice that it does not

intend to accept the goods. *Fabrica De Tejidos Imperial*, 218 F. Supp. 2d at 977.

Complaining about the quality of goods is insufficient because it "is simply not

16

the same thing as a rejection." *Id.* A buyer must provide a specific and detailed report of what goods are being rejected and why. *See id.*; *Anthony v. Country Life Mfg., L.L.C.*, No. 02 C 1601, 2002 U.S. Dist. LEXIS 19445, at *11 (N.D. Ill. Oct. 9, 2002) (noting that a rejection is proper "only where the manufacturer is somehow apprised of the trouble with the *particular product purchased by a particular buyer.*") (internal citations omitted). Additionally, the resale of goods is incompatible with any alleged rejection of the goods by the buyer. *Id.* at 977-78; *MacSteel Int'l USA Corp. v. Superior Prods. Co., Inc.*,  Case No. 98-C-7182, 2002 U.S. Dist. LEXIS 5573, at *20 (N.D. Ill. Mar. 27, 2002); *see also Lorenzo Banfi Di Banfi Renzo & Co. v. Davis Congress Shops, Inc.*, 568 F. Supp. 432, 433-34 (N.D. Ill. 1983).

The buyer must make a prompt examination of goods to determine if they are conforming, and the buyer must communicate any rejection to the seller within a "reasonable time" after delivery. 810 ILCS 5/2-602(1). The length of a "reasonable time" for notification of rejection is not rigid, 810 ILCS 5/1-205, but Illinois courts have previously held that a two-month delay in notice from when the defect should have been discovered is unreasonable. *Fabrica De Tejidos Imperial*, 218 F. Supp. 2d at 977.

If a buyer rejects goods, he must give the seller an opportunity to cure any defect prior to the delivery deadline. 810 ILCS 5/2-508; *see Anthony*, 2002 U.S. Dist. LEXIS 19445, at *11-12. "[A] principal purpose underlying the obligation . . .

17

to make a seller aware within a reasonable time that its goods do not conform, is to prepare the ground for working out a commercial dispute through compromise." *Pace Am., Inc. v. Elixir Indus.*, No. 06 C 4661, 2009 U.S. Dist. LEXIS 6281, at *15 (N.D. Ill. Jan. 27, 2009) (internal citation omitted).

Oak Leaf did not reject the goods delivered by DDI within a reasonable time. The Manufacturers began delivering products to Oak Leaf in June 2010 and, while the parties discussed improvements to the products from June until December 2010, Oak Leaf did not indicate a rejection of the goods. Oak Leaf even inspected and sold the goods that it received from DDI to its customers from June 2010 until December 2010, an activity that is wholly inconsistent with any alleged rejection of the goods.

The first time that DDI learned that Oak Leaf was allegedly rejecting the goods was in a letter from Oak Leaf's counsel threatening suit in December 2010. Even this letter, however, did not constitute an effective rejection of the goods because it was not timely and did not sufficiently specify which goods were defective or why Oak Leaf believed they were defective. The letter came *six months* after DDI began shipping goods to Oak Leaf and three months after Oak Leaf submitted a new Purchase Order to DDI. Additionally, the letter only specified generally the products that were allegedly defective, but did not provide detail as to when Oak Leaf received the products from DDI.

18

Even if the Court were to determine that Oak Leaf rejected the products, such rejection would be improper because Oak Leaf did not give DDI an opportunity to cure any alleged deficiencies. DDI has always been willing to adjust the manufacturing process to meet Oak Leaf's specific needs. For example, when Oak Leaf requested DDI modify alleged non-conformities on or around October 2010, DDI sent a detailed list to the Manufacturers asking them to remedy Oak Leaf's concerns. DDI also agreed to modify its production to create the ropes in the United States after DDI learned that these products did not pass the TMA testing. These actions demonstrate that DDI would have cured any alleged non-conformities if Oak Leaf notified DDI of a rejection of the goods.

Oak Leaf's cessation of payments in November 2010 and its severely belated "rejection" letter—both occurring months after the Manufacturers began shipping the goods to Oak Leaf—failed to notify DDI of any alleged rejection or give it an opportunity to cure. As such, Oak Leaf did not reject the goods the Manufacturer delivered to it under its contract with DDI.

### 3.    Oak Leaf did not revoke its acceptance of the goods.

The Illinois Commercial Code allows a buyer to revoke an acceptance of goods, but Oak Leaf's attempted revocation in December 2010 was ineffective. Any revocation of acceptance must occur within a reasonable time of discovering

19

the ground for revocation and is only effective upon notification to the seller. 810 ILCS 5/2-608(2). Repeated acceptance of plainly non-compliant goods without timely objection "dissipates" any alleged revocation. *Greenwich Indus., L.P. v. Leggett & Platt, Inc.*, No. 07 C 6550, 2009 U.S. Dist. LEXIS 49478, at *15-16 (N.D. Ill. June 11, 2009).

If a buyer knew of alleged non-conformities at the time of acceptance, then it cannot revoke acceptance because of the non-conformities unless it reasonably assumed the non-conformity would be seasonably cured. 810 ILCS 5/2-607(2). A buyer cannot revoke acceptance of part of a commercial unit and simultaneously or contemporaneously sell the rest. *S.A.M. Elecs. v. Osaraprasop*, 39 F. Supp. 2d 1074, 1086 (N.D. Ill. 1999).

Oak Leaf did not revoke its acceptance of the goods in the December 2010 letter. DDI knows that Oak Leaf inspected every product before it was sold to customers because Oak Leaf was required to open each product to ensure that it included a safety harness. DDI employees also viewed Oak Leaf employees completing inspections. Such inspections would have alerted Oak Leaf to any of the alleged non-conformities in the goods, but they did not result in any notification that Oak Leaf planned to revoke its acceptance of the goods. Given Oak Leaf's inspections and its clear ability to communicate a revocation to DDI,

20

its December 2010 letter claiming to "revoke" acceptance was improper under the Illinois Commercial Code.

Oak Leaf's alleged "revocation" is also invalid because Oak Leaf took actions that were wholly inconsistent with a later revocation of the product. Oak Leaf accepted various shipments of the goods from the Manufacturers and even submitted an additional Purchase Order in September 2010 requesting the delivery of more goods. Oak Leaf also agreed to purchase product from DDI for 2011. Oak Leaf's acceptance of these goods over time and its communicated desire to continue a manufacturing relationship with DDI dissipates any alleged revocation of acceptance. The Illinois Commercial Code thus precludes Oak Leaf from revoking its acceptance and requires Oak Leaf to pay DDI the contract rate for the accepted goods.

**B.     DDI is likely to succeed on its promissory-estoppel claim.**

Even if the Court were to determine that DDI could not sustain a breach of contract claim, DDI can pursue a promissory-estoppel claim against Oak Leaf. Four elements that are necessary to establish promissory-estoppel: (1) an unambiguous promise; (2) reliance upon the promise; (3) foreseeable reliance; and (4) that reliance caused injury or detriment to the promisee. *Pearson Bros. Co. v. Pearson*, 113 B.R. 469, 477-78 (C.D. Ill. 1990).

Oak Leaf made unambiguous promises to DDI that it would be compensated for manufacturing and delivering products. In reliance, DDI arranged for the Manufacturers to produce the product. Without promise of payment, DDI would not have: (1) sent Oak Leaf's samples to the Manufacturers and arranged for tooling and set-up; (2) advanced Oak Leaf money to pay debts owed to other vendors to sustain production; (3) worked with the Manufacturers to create the products; (4) arranged for repeated inspections and testing of the products; and (5) delivered the products to Oak Leaf.

Oak Leaf knew that DDI took these steps in reliance on Oak Leaf's promises, showing that the reliance was foreseeable. DDI was injured by its reliance on Oak Leaf's promises because DDI expended its own capital in advancing production, paying for the set-up, raw materials, and delivering the goods. DDI is likely to succeed on its promissory-estoppel claim because it was injured by reasonable and foreseeable reliance on an unambiguous promise to pay made by Oak Leaf.

**C.     DDI is likely to succeed on its unjust enrichment claim.**

DDI is also likely to succeed on its unjust enrichment claim. Unjust enrichment applies where the defendant has "unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the

22

fundamental principles of justice, equity, and good conscience." *Global Tech. &*

*Trading, Inc. v. Satyam Computer Servs.*, No. 09 CV 5111, 2011 U.S. Dist. LEXIS

8292, at *9 (N.D. Ill. Jan. 28, 2011) (internal citations omitted).

DDI arranged for the manufacture and delivery of approximately

$2.3 million in goods for Oak Leaf. While DDI repossessed some of these

products, Oak Leaf has either retained or sold approximately $806,000 in

products without payment to DDI. Allowing Oak Leaf to retain these assets,

including profits from the sale of the manufactured goods, is unjust. Moreover,

Oak Leaf's refusal to allow DDI to sell goods that it diverted and repossessed

from Oak Leaf is unjust because it is foreclosing DDI's ability to collect any

money off products that were specifically manufactured for Oak Leaf.

**D.    Oak Leaf is unlikely to succeed on its breach of express warranty claim.**

Oak Leaf's express warranty claim is unlikely to succeed. Express

warranties can be created by a seller's affirmation, a description of the goods

made as part of the basis of the bargain, or by a sample or model. 810 ILCS

5/2-313. In particular, "[a]ny sample or model which is made part of the basis of

the bargain creates an express warranty that the whole of the goods shall

conform to the sample or model." 810 ILCS 5/2-313(a).

Where a buyer approved samples of a product before shipment, no breach of express warranty claim may lie. For instance, in *Trans-Aire Int'l, Inc. v. N. Adhesive Co.*, the Northern District of Illinois held that there was no breach of express warranty because the product delivered conformed to the samples that the buyer had inspected and approved. No. 83 C 7003, 1988 U.S. Dist. LEXIS 630, at *9-10 (N.D. Ill. Jan. 26, 1988). Moreover, "[i]t is well established that notice of defects is not a notice of a breach of warranty." *Charles v. Judge & Dolph, Ltd.*, 263 F.2d 864, 867 (7th Cir. 1959). To claim breach of warranty, the buyer must provide unequivocal notice that the contract was breached. *Id.* at 868. In such cases, the buyer cannot make only general statements that the products are allegedly defective. *Id.*

DDI did not violate any express warranties in creating the Lone Wolf Portable Tree Stands or CamoFlex products. Oak Leaf has never alleged that DDI made any specific representations as to the quality or nature of the goods. Instead, Oak Leaf suggests that DDI gave a general express warranty to produce conforming goods. (Compl. ¶ 17, Dkt. No. 1.) Oak Leaf's "general" breach of express warranty claim is not sustainable because Oak Leaf approved samples of the products before they were shipped. (Priest Decl. ¶ 13, Exs. K, L, M.) Oak Leaf does not allege that the delivered products differed from samples approved by

24

Oak Leaf. DDI cannot be faulted for delivering products specifically ordered by Oak Leaf.

Oak Leaf's breach of express warranty claim is also unsustainable because Oak Leaf failed to provide timely and specific notice of any alleged breach. Oak Leaf can only point to its December 2010 letter from counsel as evidence of notice of an alleged breach. This letter came *six months* after DDI's first shipment of goods, *six months* after Oak Leaf had an opportunity to inspect the goods, and *three months* after Oak Leaf ordered additional products from DDI. Moreover, as discussed above, the letter from Oak Leaf's counsel failed to specify which shipment of goods to Oak Leaf were allegedly problematic.

No colorable claim for breach of express warranty exists because DDI did not specifically represent any warranties and the goods shipped matched the products that Oak Leaf had monitored, inspected, and approved.

### E.    Oak Leaf is unlikely to succeed on its breach of implied warranty claim based on merchantability of goods.

Oak Leaf is also unlikely to succeed on its breach of the implied warranty of merchantability claim. In sales from merchants, an implied warranty exists that the goods will be merchantable, meaning that the goods must "pass without objection in the trade under the contract description" and be "fit for the ordinary purposes for which such goods are used." 810 ILCS 5/2-314. Generally,

25

manufacturers are not held liable for defects when the product was made pursuant to the purchaser's design. *See, e.g., Lesnefsky v. Fischer & Porter Co.*, 527 F. Supp. 951, 955 (E.D. Pa. 1981). No implied warranties "arise from defects that an examination of samples should have revealed." *Quaker Alloy Casting Co. v. Gulfco Indus., Inc.*, 686 F. Supp. 1319, 1334 (N.D. Ill. 1988).

Oak Leaf cannot succeed on a breach of implied warranty claim based on merchantability because the products delivered met (or exceeded) industry standards. In May 2010, Oak Leaf sent samples of the Lone Wolf Portable Tree Stands and related accessories to the Scientific Testing Group for TMA testing. The Scientific Testing Group independently determined that all of the manufactured products passed TMA guidelines except for two rope products used in the safety harness system. For the products that did not pass the testing, DDI agreed to use Oak Leaf's incumbent supplier to manufacture the non-complying ropes in the United States, and this issue was corrected before the deliveries began. The Scientific Testing Group's TMA testing shows that the delivered products met industry standards and could "pass without objection in the trade" as required by the Illinois Commercial Code.

**F.     Oak Leaf is unlikely to succeed on its breach of implied warranty claim based on fitness for a particular purpose.**

Oak Leaf cannot succeed on an implied warranty claim based on fitness for a particular purpose because Oak Leaf did not rely on DDI's skill to furnish suitable goods. An implied warranty may exist if the seller has reason to "know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods." 810 ILCS 5/2-315. The plaintiff must show the seller had reason to know of any particular purpose for which the goods were required, and that the plaintiff relied on the seller's skills or judgment to select suitable goods. *Econ. Folding Box Corp. v. Anchor Frozen Foods, Corp.*, No. 04 CV 4485, 2007 U.S. Dist. LEXIS 19603, at *27 (N.D. Ill. Mar. 27, 2007).

The obvious problem with Oak Leaf's breach of implied warranty for a particular purpose claim is that DDI had no prior experience manufacturing the requested products whereas Oak Leaf has been engaged in the sale of these products for over twenty years. Oak Leaf even provided manufacturing guidance by sending tooling to DDI before production began. DDI never claimed to have special expertise in the area of tree stands and hunting blinds. DDI's role was to work with the Manufacturers to make the products in accordance with Oak Leaf's design—DDI did not contribute design ideas or ever attempt to supersede Oak Leaf's judgment regarding how the products should be made. In

27

fact, on two separate occasions, Oak Leaf executives travelled to China to approve the manufacturing of the products before the Manufacturers proceeded with production of the goods.

DDI relied on Oak Leaf's expertise and skill, not the reverse. If the products are truly not fit for their intended purpose, it cannot be reasonably claimed that Oak Leaf, a company specializing in this industry, detrimentally relied on DDI's opinion to determine if the products were fit for their specialized purpose. Oak Leaf thus cannot sustain its breach of implied warranty claim because it did not rely on DDI's skill or judgment to select or furnish suitable goods.

## III.    The Balance of Equities Favors DDI.

The financial harm posed to DDI is more severe than any inconvenience to Oak Leaf in creating a trust or escrow or freezing Oak Leaf's assets for the pendency of the litigation. This balancing of equities is a crucial part of evaluating a preliminary injunction. *Am. Hosp. Supply*, 780 F.2d at 595. Oak Leaf is insolvent and likely will be unable to pay any judgment secured at the conclusion of the present action. If Oak Leaf cannot pay such a judgment, DDI would lose $1.8 million dollars that was rightfully earned by making products at Oak Leaf's request. DDI would have to absorb both the costs of creating the

product for Oak Leaf and the lost profits—a crippling financial blow to a company who did nothing but fulfill orders for an unstable purchaser.

The requested injunction will not cause great injury to Oak Leaf. If DDI is not successful in its counterclaims—an unlikely result as shown above—Oak Leaf will regain all funds placed in the trust or escrow at the conclusion of the litigation. Therefore, the balance of equities favors granting the requested preliminary injunction to create a constructive trust or escrow for the amount of the counterclaims, or in the alternative, entering an order freezing Oak Leaf's assets. The Court risks causing far more harm to DDI if the trust, escrow, or freezing order is not created than it risks in harming Oak Leaf by granting the injunction.

## IV.   The Public Interest Supports Granting This Preliminary Injunction.

The final consideration in evaluating a motion for preliminary injunction is whether the public interest is affected by a grant or denial of the injunction. *Am. Hosp. Supply,* 780 F.2d at 601. Receiving payment for goods and services rendered is a crucial part of any functioning economy, and the fair and efficient distribution of assets of an insolvent company furthers the public interest. *See, e.g.*, *Cunard S.S. Co. v. Salen Reefer Servs. AB,* 773 F.2d 452, 459 (2d Cir. 1985); *Com. Of Pa. v. Mid-Atlantic Toyot*a *Distrib*, 704 F.2d 125, 132 (4th Cir. 1983). Companies rely on payment for the costs and labor required in fulfilling a purchase order. If

29

companies are not confident that courts will work to their fullest ability to ensure that payment is delivered where owed, companies will become more risk averse and hesitant to enter into contracts with new or unfamiliar customers. The public interest, which is deeply invested in maintaining a healthy economy, supports taking measures to ensure that debts are paid. In this case, allowing Oak Leaf to continue earning and holding money based upon products it has not paid DDI pursuant to its contract contravenes the public interest.

## V.    The Court Should Order No More Than a Nominal Bond.

Federal Rule of Civil Procedure 65(c) requires that a movant for a preliminary injunction give "security in an amount that the court considers proper" before any preliminary injunction issues. Fed. R. Civ. P. 65(c). A district court may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his conduct. *See, e.g.*, *Berg v. Teamsters*, No. 10 C 5334, 2010 U.S. Dist. LEXIS 93891, at *16 (N.D. Ill. Sep. 9, 2010). Because only minimal costs are associated with complying with the proposed injunction and because DDI will suffer irreparable harm if the Court does not grant its injunction, the Court should order a minimal bond or no bond at all. Moreover, if the Court determines that a bond is necessary, the Court should also order Oak Leaf pay a bond for its refusal to allow DDI to mitigate its

damages and sell goods that it diverted and repossessed from Oak Leaf that currently sit in DDI's warehouse in Dubuque, Iowa.

## Conclusion

For the foregoing reasons, the Court should order a constructive trust or escrow, or in the alternative, grant an order freezing Oak Leaf's assets to ensure that DDI will have an adequate remedy at the end of trial.

Dated this 18th day of July, 2011.

**ROBINS, KAPLAN, MILLER & CIRESI L.L.P.**

By:    s/ *Barry Landy*
      Christopher W. Madel
      MN Reg. No. 387745
      Barry M. Landy
      MN Reg. No. 391307

      2800 LaSalle Plaza
      800 LaSalle Avenue
      Minneapolis, MN 55402-2015
      Telephone: 612-349-8500
      Facsimile: 612-339-4181
      E-mail: cwmadel@rkmc.com
      E-mail: bmlandy@rkmc.com

      H. Patrick Morris
      IL State Bar No. 6187083
      **JOHNSON & BELL LTD.**
      33 West Monroe Street, Suite 2700
      Chicago, IL 60603-5404
      Telephone: 312-372-0770
      Facsimile: 312-372-9818

E-mail: morrisp@jbltd.com


*Attorneys for Defendant*
*Double Dragon International, Inc.*

32

## <u>Certificate of Service</u>

I hereby certify that on July 18, 2011, I electronically filed this First Amended Memorandum of Law in Support of Its Motion for a Preliminary Injunction using the CM/ECF system which will automatically send email notification of such filing to the following counsel of record who are CM/ECF participants:

Timothy J. Cassidy
CASSIDY & MUELLER
416 Main Street, Suite 323
Peoria, IL 61602
E-mail: tcassidy@cassidymueller.com

H. Patrick Morris
JOHNSON & BELL LTD.
33 West Monroe Street, Suite 2700
Chicago, IL 60603-5404
E-mail: morrisp@jbltd.com

Christopher William Madel
ROBINS KAPLAN MILLER & CIRESI, L.L.P.
2800 LaSalle Plaza
800 LaSalle Ave
Minneapolis, MN 55402-2015
E-mail: cwmadel@rkmc.com

Barry M. Landy
ROBINS KAPLAN MILLER & CIRESI, L.L.P.
2800 LaSalle Plaza
800 LaSalle Ave
Minneapolis, MN 55402-2015
E-mail: bmlandy@rkmc.com

David F. Fanning
JOHNSON & BELL LTD.
33 West Monroe Street, Suite 2700
Chicago, IL 60603-5404
E-mail: fanningd@jbltd.com

Johnson & Bell, Ltd.
By: /s/ H. Patrick Morris
  H. Patrick Morris
  Illinois State Bar #6187083
  Attorney for Defendant
  Johnson & Bell, Ltd
  33 West Monroe St., Suite 2700
  Chicago IL  60603
  morrisp@jbltd.com