**E-FILED**
Wednesday, 30 November, 2011  01:46:40 PM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

| | |
|---|---|
| OAK LEAF OUTDOORS, INC.,<br>an Illinois corporation,<br><br>      Plaintiff, Counter-<br>      Defendant,<br><br>      and,<br><br>WEAVER ENTERPRISES, LTD.,<br>an Nevada corporation,<br><br>      Counter-Defendant,<br><br>      and,<br><br><br>JARED SCHLIPF, JENNY SCHLIPF, JEFF WEAVER, JERRY WEAVER, AND NANCY WEAVER, Illinois residents,<br><br>      Counter-Defendants,<br><br><br>      v.<br><br>DOUBLE DRAGON INTERNATIONAL, INC., an Iowa corporation, d/b/a DDI, INC.,<br><br>      Defendant, Counter-<br>      Plaintiff. | No.  1:11-cv-01175-MMM-JAG<br><br>**SECOND AMENDED COUNTERCLAIM AND JURY TRIAL DEMAND**<br><br>**[EQUITABLE RELIEF IS SOUGHT]** |

## SECOND AMENDED COUNTERCLAIM AND JURY TRIAL DEMAND

### The Parties

1.      Double Dragon International, Inc. (DDI) is an Iowa corporation with its principal place of business in Dubuque, Iowa. DDI administers the subcontracting of manufacturers for its clients to create products in China.

2.      Oak Leaf Outdoors, Inc. (Oak Leaf) is an Illinois corporation with its principal place of business in Brimfield, Illinois. Oak Leaf sells deer hunting tree stands, blinds, and related accessories under the "Lone Wolf Portable Tree Stand" and "CamoFlex" brand names to its customers.

3.      Weaver Enterprises, Ltd. (Weaver Enterprises) is a Nevada corporation with its principal place of business in Peoria, Illinois. Weaver Enterprises operates over twenty franchises of fast food chains, owns a country club, a golf course called Weaver Ridge, and other business entities.

4.      Upon information and belief, Oak Leaf is an alter ego of Weaver Enterprises meaning that interactions between DDI and Oak Leaf were actually interactions between DDI and Oak Leaf's true corporate entity, Weaver Enterprises. Upon information and belief, Weaver Enterprises created Oak Leaf as a separate and distinct corporation to limit its liability related to the sale of deer hunting tree stands.

5.      Jared Schlipf is an Illinois resident, a co-President, officer, and director of Oak Leaf, and owns 25% of Oak Leaf's common stock.

6.      Jeff Weaver is an Illinois resident, a co-President, officer, and director of Oak Leaf, and owns 31.25% of Oak Leaf's common stock.

7.      Jerry Weaver is an Illinois resident, President of Weaver Enterprises, an officer and director of Oak Leaf, and owner of 12.5% of Oak Leaf's common stock.

8.      Nancy Weaver is an Illinois resident, the secretary of Weaver Enterprises, an officer and director of Oak Leaf, and an owner of 12.5% of Oak Leaf's common stock.

9.      Jenny Schlipf is an Illinois resident, a Oak Leaf employee, and owns 6.25% of Oak Leaf's common stock.

10.     Upon information and belief, Oak Leaf is an alter ego of Jared Schlipf, Jenny Schlipf, Jeff Weaver, Jerry Weaver, and Nancy Weaver (collectively "Oak Leaf's Shareholders"), meaning that interactions between DDI and Oak Leaf were actually interactions between DDI and Oak Leaf's Shareholders. Upon information and belief, Oak Leaf's Shareholders created Oak Leaf as a separate and distinct corporation to limit its liability related to the sale of deer hunting tree stands and undercapitalized Oak Leaf when forming it to make it judgment proof.

### Jurisdiction and Venue

11.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(c)(1) and 1332(a)(1). Diversity of citizenship exists between Oak Leaf, Weaver Enterprises, and Oak Leaf's Shareholders and DDI and the matters in controversy exceed the sum or value of $75,000.

12.     Venue is appropriate under 28 U.S.C. § 1391(a)(2), as a part of the events or omissions giving rise to the counterclaim occurred in Peoria, Illinois, which is located within the judicial district of this Court. DDI asserts that the Northern District of Iowa is a more convenient forum under 28 U.S.C. § 1404(a).

### Background Facts

**I.      In June 2009, DDI and Oak Leaf Enter into Contractual Negotiations.**

13.     Oak Leaf initiated contact with DDI in June 2009 to discuss the possibility of DDI manufacturing Lone Wolf Portable Tree Stands and related accessories in China.

14.     Oak Leaf has a brand name known as "Lone Wolf Portable Tree Stands" under which it sells deer hunting tree stands and related accessories to customers.

15.     Oak Leaf has a brand name known as "CamoFlex" under which it sells deer hunting blinds and related accessories to customers.

16.     Deer hunting tree stands are a product that hunters purchase to sit in trees and hunt deer. Deer hunting blinds are tents that hunters use when hunting deer.

17.     Oak Leaf's Lone Wolf Portable Tree Stand line was previously manufactured domestically.

18.     DDI and Oak Leaf representatives met in July 2009 to discuss whether DDI could produce Lone Wolf Portable Tree Stands for Oak Leaf using DDI's China contractors.

19.     In July 2009, Oak Leaf sent samples of its Lone Wolf Portable Tree Stand product and related accessories to DDI in Dubuque, Iowa.

20.     Upon information and belief, Oak Leaf was aware that DDI sent the samples of its Lone Wolf Portable Tree Stand product and related accessories to DDI's contractors in China.

21.     In August 2009, DDI informed Oak Leaf that DDI required "tooling" (i.e., a mold to manufacture the products) and set-up fees to begin production.

22.     In August 2009, Oak Leaf approached DDI to manufacture deer hunting blinds under Oak Leaf's CamoFlex brand name, which DDI agreed to do.

23.     In September 2009, Oak Leaf representatives met with leaders of DDI in Dubuque, Iowa to discuss the cost of the tooling and set-up fees.

24.     On or about September 30, 2009, DDI sent Oak Leaf a letter outlining the general terms of the agreement to manufacture Oak Leaf's Lone Wolf Portable Tree Stands, CamoFlex blinds, and related accessories.

25.     On or about September 30, 2009, representatives at DDI's China contractors told DDI that it could create samples and begin production of the Lone Wolf Portable Tree Stands and related accessories two weeks after receiving the tooling. DDI told Oak Leaf this information.

26.     On or about September 30, 2009, DDI sent Oak Leaf one proforma invoice documenting the amount DDI charged Oak Leaf for the Lone Wolf Portable Tree Stands, CamoFlex blinds, and related accessories and for tooling and set-up fees.

27.     The proforma invoice dated on or about September 30, 2009 showed that the total cost for the tooling and set-up fees was $28,978.00, to be paid upon receipt of the invoice.

28.     The proforma invoice dated on or about September 30, 2009 documented the price per product that Oak Leaf would be required to pay for the Lone Wolf Portable Tree Stands, CamoFlex blinds, related accessories, and costs associated with the tooling and set-up fee.

29.     Upon information and belief, Oak Leaf lacked the funds necessary in 2009 to pay for the tooling and set-up fees.

30.     On or about October 22, 2009, DDI sent Oak Leaf a revised proforma invoice documenting the costs Oak Leaf was required to pay for the Lone Wolf Portable Tree Stands, CamoFlex blinds, and related accessories and for the tooling and set-up fees.

31.     DDI provided Oak Leaf with the revised proforma invoice dated on or about October 22, 2009 so that DDI would obtain the necessary tooling faster.

32.     The proforma invoice dated on or about October 22, 2009 showed that the tooling and set-up fees were set at $28,978.00 and allowed for Oak Leaf to pay 50% upon receipt of the proforma invoice and to amortize the other 50% over the first year of production.

33.     In early November 2009, executives of Weaver Enterprises, including Robert Weaver, and upon information and belief,  Weaver Enterprises' Accountant named Eugene Retzer, visited DDI's Dubuque, Iowa office to approve the terms, pricing, payment structure, and tooling requirements for DDI's production of the Lone Wolf Portable Tree Stands, CamoFlex

blinds, and related accessories.

34.    Executives of Weaver Enterprises were intimately involved with Oak Leaf's negotiations to purchase the Lone Wolf Portable Tree Stands, CamoFlex blinds, and related accessories from DDI.

35.    DDI believed that when it was negotiating with Oak Leaf to create the deer hunting tree stands it was also negotiating with Weaver Enterprises.

## II.    DDI Receives the Final Shipment of Oak Leaf's Tooling, its China Contractors Begin Producing Sample Products, and Oak Leaf Employees Travel to China to Oversee Production.

36.    In late November 2009, Oak Leaf paid DDI $14,489.00. This payment represented half the amount due to DDI for the tooling and set-up fees.

37.    DDI did not receive the final shipment of tooling from Oak Leaf until mid-December 2009.

38.    Upon information and belief, Oak Leaf knew that the delay in obtaining the tooling slowed the time by which DDI's China contractors was able to produce the Lone Wolf Portable Tree Stands, CamoFlex blinds, and related accessories.

39.    After DDI received the tooling from Oak Leaf, DDI sent the tooling to the China manufacturing plant to begin manufacturing the products. It took around 10 weeks for the China plant to receive the tooling for the Lone Wolf Portable Tree Stands, CamoFlex blinds, and related accessories, due to shipping time and office closings for the Chinese New Year.

40.    Because DDI knew that it would take one to two months for DDI's China contractors to receive the tooling, DDI informed its China contractors that it could begin creating tooling for components of the Lone Wolf Portable Tree Stands, CamoFlex blinds, and related accessories to speed the production process for when the China contractors received the

complete tree stands, blinds, and related accessories tooling.

41.     In January 2010, DDI received samples of the components parts necessary to make the Lone Wolf Portable Tree Stands, CamoFlex blinds, and related accessories from the China factory. DDI showed these samples to Oak Leaf and Oak Leaf approved the production of these component parts.

42.     In late March 2010, Jim Pullen, Account Executive of DDI, and Mike Walston, then Chief Operations Officer of Oak Leaf, travelled to China to approve the production of the components used to make the Lone Wolf Portable Tree Stands, CamoFlex blinds, and related accessories.

43.     While in China, Mr. Walston informed Mr. Pullen that the production complied with Oak Leaf's requests. Mr. Walston informed DDI of several small changes and approved DDI's production of the Lone Wolf Portable Tree Stands.

44.     Shortly after Mr. Walston and Mr. Pullen's trip to China, in April 2010, Mr. Walston travelled to DDI's Dubuque, Iowa office to discuss packaging, labeling, and boxing of the Lone Wolf Portable Tree Stands, CamoFlex blinds, and related accessories.

45.     In April 2010, DDI's China contractor shipped samples of the component parts for the Lone Wolf Portable Tree Stands, CamoFlex blinds, and related accessories to DDI. DDI provided these goods to Oak Leaf for inspection.

46.     Upon viewing the samples in April 2010, Oak Leaf informed DDI that some modifications to the Lone Wolf Portable Tree Stands, CamoFlex blinds, and related accessories were required.

47.     DDI agreed to all of Oak Leaf's requested modifications of the Lone Wolf Portable Tree Stands, CamoFlex blinds, and related accessories. Oak Leaf then approved the samples for production.

48.     On April 10, 2010, Mr. Pullen and Jared Schlipf, Oak Leaf's President, travelled to China to approve continued production of the Lone Wolf Portable Tree Stands, CamoFlex blinds, and related accessories the manufacturing plant in China.

49.     While in China in April 2010, Mr. Pullen and Mr. Schlipf viewed completed Lone Wolf Portable Tree Stands, CamoFlex blinds, and related accessories.

50.     While visiting the manufacturing plant in China, Mr. Schlipf informed Mr. Pullen of several changes and approved DDI's continued production of the Lone Wolf Portable Tree Stands, CamoFlex blinds, and related accessories.

51.     Near the end of April 2010, DDI's China contractors shipped completed samples of the Lone Wolf Portable Tree Stands, CamoFlex blinds, and related accessories to DDI. DDI then sent these samples to Oak Leaf.

**III.     Oak Leaf Approved Samples of Products Created by the Manufacturers and Submitted a Purchase Order.**

52.     On or about April 27, 2010, after receiving completed samples of the Lone Wolf Portable Tree Stands, CamoFlex blinds, and related accessories, Oak Leaf provided DDI with six purchase orders, under which Oak Leaf requested DDI to manufacture certain Lone Wolf Portable Tree Stands, CamoFlex blinds, and related accessories, and sell the same to Oak Leaf at the specified price of approximately $2,000,000.00 (the "Purchase Order").

53.     On or about April 30, 2010, Oak Leaf submitted six revised purchase orders and three new purchase orders that changed the quantity ordered of certain goods, such that the purchase price was approximately $1,900,000.00 (the "Revised Purchase Order").

54.     In agreeing to the Purchase Order and the Revised Purchase Order, Oak Leaf did not provide DDI with all the engineering prints or specifications or any other direction beyond the negotiations and approval of samples provided by DDI for the Lone Wolf Portable Tree Stands, CamoFlex blinds, and related accessories.

55.     Oak Leaf requested that the Lone Wolf Portable Tree Stands, CamoFlex blinds, and related accessories pass Treestand Manufacturing Association (TMA) standards.

56.     Oak Leaf did not request that the Lone Wolf Tree Portable Stands, CamoFlex blinds, and related accessories meet any other standards.

57.     On May 25, 2010, DDI's President, J.B. Priest, met in Dubuque, Iowa with Mr. Schlipf, Oak Leaf's President, and Jerry Weaver, Mr. Schlipf's father-in-law and president of Weaver Enterprises, to discuss DDI's production status. During that meeting, Mr. Schlipf and Mr. Weaver represented to Mr. Priest that Oak Leaf wanted the Lone Wolf Portable Tree Stands, CamoFlex blinds, and related accessories as soon as possible.

58.     In May 2010, Oak Leaf sent samples of the Lone Wolf Portable Tree Stands, CamoFlex blinds, and related accessories to Scientific Testing Group, located in Baton Rouge, Louisiana, for TMA testing.

59.     In May 2010, Oak Leaf informed DDI of the results of the TMA testing. Scientific Testing determined that the Lone Wolf Portable Tree Stands, CamoFlex blinds, and related accessories passed TMA guidelines, with the exception of problems with a tree rope and climbing rope used in conjunction with a safety harness. As a remedy, DDI agreed to adapt and

manufacture the tree and climbing ropes in the United States. Oak Leaf agreed to this condition.

**IV.   The China Contractors Begin Shipping the Product, Oak Leaf Accept the Goods, and Submits an Additional Purchase Order.**

60.    DDI's China contractors sent Oak Leaf completed tree stands, blinds, and related accessories as early as June 2010.

61.    On June 15, 2010, a Weaver Enterprises truck came to DDI's headquarters in Dubuque, Iowa to pick up harnesses and ropes used in conjunction with the tree stands, blinds, and related accessories.

62.    From July 2010 to November 2010, DDI shipped Lone Wolf Portable Tree Stands, CamoFlex blinds, and related accessories to Oak Leaf.

63.    From July to November 2010, Oak Leaf did not return these goods or communicate a revocation of acceptance to DDI.

64.    From July to November 2010, Oak Leaf representatives contacted DDI on a daily basis and requested that DDI speed up production of the Lone Wolf Portable Tree Stands, CamoFlex blinds, and related accessories. During this time, Oak Leaf did not intimate that its agreement with DDI was revoked.

65.    Upon information and belief, from July to November 2010, employees of Oak Leaf and Weaver Enterprises inspected each product that DDI shipped prior to sending the products to their customers.

66.    In September 2010, Oak Leaf provided DDI with a second Purchase Order, under which Oak Leaf requested that DDI agree to manufacture for Oak Leaf additional Lone Wolf Portable Tree Stands, CamoFlex blinds, and related accessories, and further agreed to sell the same to Oak Leaf at the specified price of approximately $252,000.00 (the "Second Purchase Order").

67.    In late September 2010, Oak Leaf contacted DDI about pricing for the 2011 sales year for the production of Lone Wolf Portable Tree Stands, CamoFlex blinds, and related accessories.

68.    In September 2010, representatives from DDI met with representatives from Oak Leaf and Weaver Enterprises, including Jay Dameron, to discuss its manufacturing of products.

69.    Representatives from DDI and Oak Leaf met at Oak Leaf's office in early October 2010 to discuss pricing for production of the Lone Wolf Portable Tree Stands, CamoFlex blinds, and related accessories for the 2011 sales year.

70.    After this meeting in October 2010, DDI's Account Executive, Mr. Pullen, travelled to China to confirm the production of Oak Leaf's goods in the 2011 sales year. Mr. Pullen informed Oak Leaf of the production plans and Oak Leaf agreed to these terms.

**V.    Oak Leaf Has Failed to Pay DDI for Ordered Goods And Still Owes DDI Approximately $1.8 Million.**

71.    Between the Revised Purchase Order and Second Purchase Order, Plaintiff had requested approximately $2,300,000 of Lone Wolf Portable Tree Stands, CamoFlex blinds, and related accessories.

72.    From September to October 2010, Oak Leaf paid DDI approximately $575,000 of goods and services for the Lone Wolf Portable Tree Stands, CamoFlex blinds, and related accessories that Oak Leaf received from DDI.

73.    In late November 2010, Oak Leaf ceased making payments to DDI and DDI's accounts receivable from Oak Leaf reached approximately $1,800,000.

74.    After Oak Leaf ceased making payments to DDI, DDI repossessed approximately $500,000 of goods from Oak Leaf and diverted the remaining shipments of approximately $400,000 of goods to DDI's warehouse in Dubuque, Iowa.

75.     Oak Leaf has not paid DDI the approximately $1,800,000 that remains due and owing for the Lone Wolf Portable Tree Stands, CamoFlex blinds, and related accessories that were delivered to Oak Leaf and diverted and repossessed by DDI.

76.     Oak Leaf still owes DDI approximately $806,000 for Lone Wolf Portable Tree Stands, CamoFlex blinds, and related accessories that either are in its possession or sold to customers.

77.     The approximately $1,000,000 of Lone Wolf Portable Tree Stands, CamoFlex blinds, and related accessories currently in DDI's Dubuque, Iowa warehouse that DDI diverted or repossessed were specifically designed for Oak Leaf.

78.     After the delivery of the Lone Wolf Portable Tree Stands, CamoFlex blinds, and related accessories by DDI to Oak Leaf, Oak Leaf accepted the goods within the meaning of Uniform Commercial Code § 2-606(1).

79.     Oak Leaf's counsel sent a letter to DDI, dated December 13, 2010, stating, "Let this be formal written notification of rejection of the goods and/or revocation of acceptance to the extent any acceptance has been made . . . ."

80.     Oak Leaf failed to reject or cancel its agreement to purchase the Lone Wolf Portable Tree Stands, CamoFlex blinds, and related accessories from DDI within a reasonable time after delivery of such goods.

81.     DDI has performed all of the conditions of its agreement to sell the Lone Wolf Portable Tree Stands, CamoFlex blinds, and related accessories to Oak Leaf.

82.     DDI was and still is ready, willing, and able to perform the agreement according to its terms.

83.     Oak Leaf did not make an effective rejection of the goods.

84.     Oak Leaf has failed and refused to perform the agreement or to pay for the goods without just cause.

85.     The Lone Wolf Portable Tree Stands, CamoFlex blinds, and related accessories manufactured by DDI's contractors were constructed according to the general direction provided by Oak Leaf and were fully capable of satisfying the purposes for which they were manufactured, as Oak Leaf related those purposes to DDI.

**VI.     Oak Leaf is an Alter Ego of its Shareholders and Weaver Enterprises.**

86.     On February 3, 2006, Oak Leaf filed its Articles of Incorporation with the Secretary of State of Illinois. The Articles provide that 400 shares of Oak Leaf's common stock was to be issued for $1,000.

87.     Upon information and belief, Oak Leaf has been undercapitalized since its incorporation and was never capitalized with unencumbered capital.

88.     Upon information and belief, around June 2006, Jerry Weaver, Jeff Weaver (Jerry Weaver's son), and Jared Schlipf (Jerry Weaver's son-in-law), met Andre D'Aqcuisito, the then owner of Lone Wolf Manufacturing, Inc. (Lone Wolf Manufacturing) to discuss that company's Lone Wolf Portable Tree Stand product line.

89.     On June 9, 2006, Jerry Weaver, acting in his capacity as President of Weaver Enterprises, entered into an Asset Purchase Agreement with Lone Wolf Manufacturing to purchase the Lone Wolf Portable Tree Stand product line and entered into a Consulting Agreement, License Agreement, Technology Agreement, and Non-Compete & Dealer Agreement with D'Acquisto.

90.     On July 13, 2006, Weaver Enterprises assigned all of its rights and obligations under the Agreements to Oak Leaf.

91.     Upon information and belief, Oak Leaf is and has always been balance-sheet insolvent.

92.     Upon information and belief, Oak Leaf has never had enough money to operate its business on its own. Upon information and belief, Oak Leaf routinely has asked Weaver Enterprises for money to pay its bills.

93.     Since Oak Leaf acquired the Lone Wolf Portable Tree Stands product line, Weaver Enterprises has made several loans to Oak Leaf for working capital and payroll expenses, none of which were documented in loan agreements or notes.

94.     Upon information and belief, Weaver Enterprises also provided money to Oak Leaf to cover the costs of doing business, such as writing checks to pay for insurance expenses.

95.     Oak Leaf's officers represented to DDI that Jerry Weaver was Oak Leaf's financial decision-maker who had to approve financial decisions related to Oak Leaf's contract with DDI.

96.     In early November 2009, executives of Weaver Enterprises, including Robert Weaver, the Founder of Weaver Enterprises, and upon information and belief, Weaver Enterprises' Accountant Eugene Rezter, visited DDI's Dubuque, Iowa office to approve the terms, pricing, and tooling requirements for DDI's production of the Lone Wolf Portable Tree Stands, CamoFlex blinds, and related accessories.

97.     Upon information and belief, Jay Dameron, a Weaver Enterprises employee, has conducted financial projections for Oak Leaf, including meetings with Heritage Bank, Oak Leaf's main source of capital.  Dameron also assisted in providing drawings of Oak Leaf's products to Oak Leaf's vendors.

98.     Upon information and belief, Oak Leaf and Weaver Enterprises have shared services, such as conference call capabilities and trucks to pick up products. Upon information and belief, Oak Leaf and Weaver Enterprises have also shared employees to help inspect and package products to customers.

99.     Jenny Schlipf, an Oak Leaf employee (and also Jared Schlipf's wife, and Jerry Weaver's daughter) controls Jerry Weaver's email account for Weaver Enterprises from her Oak Leaf computer.

100.    Upon information and belief, there is overlap between the officers and directors at Oak Leaf and Weaver Enterprises. Jerry Weaver is the President of Weaver Enterprises and also an officer and director of Oak Leaf.  Nancy Weaver, Jerry Weaver's wife, is the Secretary of Weaver Enterprises and also an officer and director of Oak Leaf.

101.    Upon information and belief, Oak Leaf has never held a meeting of the board of directors.

102.    Upon information and belief, Jeff Weaver, Nancy Weaver, Jared Schlipf, and Jenny Schlipf paid for company expenses from their personal bank accounts, instead of issuing stock to raise additional capital.

103.    Oak Leaf's Shareholders and employees transferred money from Weaver Enterprises's accounts to Oak Leaf.

104.    An Oak Leaf Shareholder transferred funds payable to Weaver Enterprises to a checking account managed by another Shareholder to pay Oak Leaf's expenses.

105.    Upon information and belief, Oak Leaf has failed to document loans and payroll expenses for employees of Weaver Enterprises who assisted Oak Leaf in its day to day operations.

**Count One—Breach of Contract**

106.    DDI alleges and incorporates paragraphs 1 through 107 of this Counterclaim as if set forth herein in full.

107.    DDI, at all relevant times hereto, fully and properly performed all of its obligations pursuant to a contract with the Oak Leaf.

108.    Oak Leaf materially breached the terms and conditions of the contract with DDI as a result of, among other things, failing to pay sums owed to DDI for labor, services, materials, and products furnished pursuant to the contract which sums remain past due and owing from Oak Leaf to DDI.

109.    The Lone Wolf Portable Tree Stands, CamoFlex blinds, and related accessories were constructed according to plans provided by Oak Leaf and were fully capable of satisfying the purposes for which they were manufactured, as those purposes were related to DDI by Oak Leaf.

110.    At the time Oak Leaf attempted to repudiate the contract, DDI had spent significant sums of money in materials and labor toward the completion of the manufacturing of the Lone Wolf Portable Tree Stands, CamoFlex blinds, and related accessories.

111.    Certain Lone Wolf Portable Tree Stands, CamoFlex blinds, and related accessories manufactured for Oak Leaf by DDI pursuant to the contract described above and were specifically designed for Oak Leaf's needs.

112.    Oak Leaf failed to give reasonable notification of termination of its agreement with DDI as required under Uniform Commercial Code § 2-309(3).

113.    DDI has been, and still is, ready, willing, and able to perform all the conditions of the contract on DDI's part to be performed.

114.    Weaver Enterprises and Oak Leaf's Shareholders, by and through Oak Leaf, are liable for breach of contract and resulting damages for at least the following reasons:

    a.    Weaver Enterprises and Oak Leaf's Shareholders control Oak Leaf so completely that they have no separate mind or existence;

    b.    Weaver Enterprises and Oak Leaf's Shareholders used Oak Leaf as a mere instrumentality for the transaction of its own affairs without regard to their separate corporate existence;

    c.    Weaver Enterprises and Oak Leaf's Shareholders control over Oak Leaf was used to avoid payment of liabilities as demonstrated by the fact that Oak Leaf was undercapitalized for the activities that it purported to contractually undertake;

    d.    Weaver Enterprises and Oak Leaf's Shareholders control over Oak Leaf caused DDI injury in the form of economic loss because Oak Leaf did not have the resources to perform its obligations under its contract with DDI; and

    e.    Upon information and belief, Weaver Enterprises, Oak Leaf's Shareholders, and Oak Leaf co-mingle funds; do not adhere to corporate formalities, share resources, officers, directors and/or shareholders and are otherwise "alter egos" of each other.

115.    DDI has suffered damages because of the material breach of the contract by Oak Leaf in an amount to be proven at trial, but in no event less than the sum of $2,000,000.00, plus interest and attorneys' fees.

## Count Two—Unjust Enrichment

116.    DDI realleges and incorporates paragraphs 1 through 117 of this Counterclaim as if set forth herein in full.

117.    As a result of DDI furnishing labor, services, materials, and products to Oak Leaf, DDI provided a benefit to Oak Leaf.

118.    DDI avers that Oak Leaf has received a benefit from the labor, services, materials, and products provided by it to Oak Leaf without payment.

119.    Because DDI has not been paid for its labor, services, materials, and products it provided to Oak Leaf, Oak Leaf has been unjustly enriched.

120.    Weaver Enterprises and Oak Leaf's Shareholders, by and through Oak Leaf, are liable for unjust enrichment and resulting damages for at least the following reasons:

   a.    Weaver Enterprises and Oak Leaf's Shareholders control Oak Leaf so completely that they have no separate mind or existence;

   b.    Weaver Enterprises and Oak Leaf's Shareholders used Oak Leaf as a mere instrumentality for the transaction of its own affairs without regard to their separate corporate existence;

   c.    Weaver Enterprises and Oak Leaf's Shareholders control over Oak Leaf was used to avoid payment of liabilities as demonstrated by the fact that Oak Leaf was undercapitalized for the activities that it purported to undertake;

   d.    Weaver Enterprises and Oak Leaf's Shareholders control over Oak Leaf caused DDI injury in the form of economic loss because Oak Leaf did not have the resources to perform its obligations under its agreement with DDI; and

   e.    Upon information and belief, Weaver Enterprises, Oak Leaf's Shareholders, and Oak Leaf co-mingle funds; do not adhere to corporate formalities, share resources, officers, directors and/or shareholders and are otherwise "alter egos" of each other.

121.    DDI has suffered damages because of labor, services, materials, and products it provided to Oak Leaf without payment in an amount to be proven at trial, but in no event less than the sum of $2,000,000.00, plus interest and attorneys' fees.

## Count Three—Promissory Estoppel

122.    DDI realleges and incorporates paragraphs 1 through 123 of this Counterclaim as if set forth herein in full.

123.    Oak Leaf promised DDI that it would pay for DDI's labor, services, materials, and products when DDI agreed to manufacture the Lone Wolf Portable Tree Stands, CamoFlex blinds, and related accessories.

124.    Oak Leaf intended to induce reliance on its promise to pay for DDI's labor, services, materials, and products in manufacturing the Lone Wolf Portable Tree Stands, CamoFlex blinds, and related accessories when it asked DDI to manufacture the goods for it.

125.    DDI relied on Oak Leaf's promise to its detriment as Oak Leaf has not paid DDI for its time and costs spend on labor, services, materials, and products when manufacturing the Lone Wolf Portable Tree Stands, CamoFlex blinds, and related accessories.

126.    Weaver Enterprises and Oak Leaf's Shareholders, by and through Oak Leaf, are liable for promissory estoppel and resulting damages for at least the following reasons:

    a.  Weaver Enterprises and Oak Leaf's Shareholders control Oak Leaf so completely that they have no separate mind or existence;

    b.  Weaver Enterprises and Oak Leaf's Shareholders used Oak Leaf as a mere instrumentality for the transaction of its own affairs without regard to their separate corporate existence;

c. Weaver Enterprises and Oak Leaf's Shareholders control over Oak Leaf was used to avoid payment of liabilities as demonstrated by the fact that Oak Leaf was undercapitalized for the activities that it promised to undertake;

d. Weaver Enterprises and Oak Leaf's Shareholders control over Oak Leaf caused DDI injury in the form of economic loss because Oak Leaf did not have the resources to perform its obligations under its promise to DDI; and

e. Upon information and belief, Weaver Enterprises, Oak Leaf's Shareholders, and Oak Leaf co-mingle funds; do not adhere to corporate formalities, share resources, officers, directors and/or shareholders and are otherwise "alter egos" of each other.

127. DDI has suffered damages because of its reliance on Oak Leaf's promise to pay for DDI's labor, services, materials, and products when manufacturing the Lone Wolf Portable Tree Stands, CamoFlex blinds, and related accessories in an amount to be proven at trial, but in no event less than the sum of $2,000,000.00, plus interest and attorneys' fees.

## Count Four—Injunctive Relief

128. DDI realleges and incorporates paragraphs 1 through 129 of this Counterclaim as if set forth herein in full.

129. Upon information and belief, Oak Leaf is currently having financial difficulties and is near insolvency.

130. DDI will be irreparably harmed if Oak Leaf does not pay for the Lone Wolf Portable Tree Stands, CamoFlex blinds, and related accessories that it agreed to purchase from DDI.

131.     Making Oak Leaf fulfill its contractual or extra-contractual duties is in the public interest.

132.     DDI is likely to succeed on the merits of its claim because Oak Leaf is indebted to DDI for over $2,000,000 for goods and services that it agreed to purchase from it, which it has not paid. Oak Leaf accepted the goods that DDI created within the meaning of Uniform Commercial Code § 2-606. Oak Leaf failed to provide reasonable notice of rejection of the goods as required under Uniform Commercial Code §2-607.

133.     Weaver Enterprises and Oak Leaf's Shareholders, by and through Oak Leaf, are liable for injunctive relief and resulting damages for at least the following reasons:

   a.   Weaver Enterprises and Oak Leaf's Shareholders control Oak Leaf so completely that they have no separate mind or existence;

   b.   Weaver Enterprises and Oak Leaf's Shareholders used Oak Leaf as a mere instrumentality for the transaction of its own affairs without regard to their separate corporate existence;

   c.   Weaver Enterprises and Oak Leaf's Shareholders control over Oak Leaf was used to avoid payment of liabilities as demonstrated by the fact that Oak Leaf was undercapitalized for the activities that it agreed to undertake;

   d.   Weaver Enterprises and Oak Leaf's Shareholders control over Oak Leaf caused DDI injury in the form of economic loss because Oak Leaf did not have the resources to perform its obligations under its agreement with DDI; and

   e.   Upon information and belief, Weaver Enterprises, Oak Leaf's Shareholders, and Oak Leaf co-mingle funds; do not adhere to corporate formalities, share resources, officers, directors and/or shareholders and are otherwise "alter egos" of

each other.

134.    DDI has suffered damages because of its reliance on Oak Leaf's promise to pay for DDI's labor, services, materials, and products when manufacturing the Lone Wolf Portable Tree Stands, CamoFlex blinds, and related accessories and requests the Court create a constructive trust and escrow in the amount of Oak Leaf's unjust enrichment from the sale of products DDI's Manufacturers provided to it and DDI was not compensated..

WHEREFORE, DDI requests that the Court:

1.    Award judgment in favor of DDI and against Weaver Enterprises, Oak Leaf's Shareholders, and/or Oak Leaf in an amount to be proven at trial, but in no event less than the sum of $2,000,000.00.

2.    Grant DDI injunctive relief in the form of a constructive trust and escrow account for an amount not less than $2,000,000 representing the cost of goods Weaver Enterprises, Oak Leaf's Shareholders, and/or Oak Leaf ordered from DDI for which it has not paid DDI.

3.    Award DDI its attorneys' fees and other litigation expenses and costs incurred in prosecuting this action;

4.    Award DDI pre-judgment and post-judgment interest on all such amounts; and

5.    Grant DDI any further relief that the court considers just and proper.

November 30, 2011                    ROBINS, KAPLAN, MILLER & CIRESI L.L.P.


                                     By:   s/*Barry M. Landy*
                                           Christopher W. Madel
                                           MN Bar No. 230297
                                           Barry M. Landy
                                           MN Bar No. 391307

                                           2800 LaSalle Plaza
                                           800 LaSalle Ave. S.
                                           Minneapolis, MN 55402-2015
                                           Telephone:  (612) 349-8500
                                           Facsimile:  (612) 339-4181
                                           E-mail:  cwmadel@rkmc.com
                                           E-mail:  bmlandy@rkmc.com

                                           H. Patrick Morris
                                           IL State Bar No. 6187083
                                           JOHNSON & BELL LTD.
                                           33 West Monroe St., Suite 2700
                                           Chicago, IL 60603-5404
                                           Telephone:  (312) 372-0770
                                           Facsimile:  (312) 372-9818
                                           E-mail:  morrisp@jbltd.com

                                           ATTORNEYS FOR DOUBLE DRAGON
                                           INTERNATIONAL, INC.

**Certificate of Service**

I hereby certify that on November 30, 2011, I electronically filed the following:

Second Amended Counterclaim and Jury Trial Demand

using the CM/ECF system which will automatically send e-mail notification of such filing to the following counsel of record who are CM/ECF participants:

Timothy J. Cassidy
CASSIDY & MUELLER
416 Main Street, Suite 323
Peoria, IL 61602
E-mail: tcassidy@cassidymueller.com

Christopher William Madel
ROBINS KAPLAN MILLER & CIRESI, L.L.P.
2800 LaSalle Plaza
800 LaSalle Ave
Minneapolis, MN 55402-2015
E-mail: cwmadel@rkmc.com

H. Patrick Morris
JOHNSON & BELL LTD.
33 West Monroe Street, Suite 2700
Chicago, IL 60603-5404
E-mail: morrisp@jbltd.com

Barry M. Landy
ROBINS KAPLAN MILLER & CIRESI, L.L.P.
2800 LaSalle Plaza
800 LaSalle Ave
Minneapolis, MN 55402-2015
E-mail: bmlandy@rkmc.com

David F. Fanning
JOHNSON & BELL LTD.
33 West Monroe Street, Suite 2700
Chicago, IL 60603-5404
E-mail: fanningd@jbltd.com

November 30, 2011.                    ROBINS KAPLAN MILLER & CIRESI, L.L.P.


                              By: _s/ Barry M. Landy_____
                                   Barry M. Landy
                                   2800 LaSalle Plaza
                                   800 LaSalle Ave
                                   Minneapolis, MN 55402-2015
                                   (612) 349-8588
                                   E-mail: bmlandy@rkmc.com

82611138.1