**E-FILED**
Friday, 02 November, 2012 09:01:51 AM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

| | |
|---|---|
| OAK LEAF OUTDOORS, INC., an Illinois corporation, | |
| Plaintiff, | |
| v. | |
| DOUBLE DRAGON INTERNATIONAL, INC., an Iowa corporation, d/b/a DDI, INC., | No. 1:11-cv-01175-MMM |
| Defendant and Counter-Plaintiff, | |
| v. | |
| OAK LEAF OUTDOORS, INC., an Illinois corporation, WEAVER ENTERPRISES, LTD, a Nevada corporation, JARED SCHLIPF, JENNY SCHLIPF, JEFF WEAVER, JERRY WEAVER, and NANCY WEAVER, Illinois residents, | |
| Counter-Defendants. | |

## SECOND AMENDED COMPLAINT

NOW COMES the Plaintiff, OAK LEAF OUTDOORS, INC., an Illinois corporation, by its attorneys, CASSIDY & MUELLER, P.C. and WARNER NORCROSS & JUDD LLP, and for its Second Amended Complaint against the Defendant, DOUBLE DRAGON INTERNATIONAL, INC., an Iowa corporation, d/b/a DDI, INC., states as follows:

### COUNT I
### (Breach of Express Warranty, Sec. 2-313 Commercial Code)

1.     The transactions and occurrences alleged herein occurred in Peoria County, Illinois.

2.      The Plaintiff, OAK LEAF OUTDOORS, INC., an Illinois corporation, (hereinafter referred to as "OAK LEAF") is doing business in Peoria County, Illinois, and is in the business of selling both wholesale and retail deer hunting tree stands and related accessories.

3.      The Defendant, DOUBLE DRAGON INTERNATIONAL, INC., an Iowa corporation, d/b/a DDI, INC., (hereinafter referred to as "DDI") is doing business in Peoria County, Illinois, and its business includes the manufacture and sale of goods and products including deer hunting tree stands and its accessories.

4.      On or about September 30, 2009, DDI entered into an agreement in Peoria County with OAK LEAF to sell to OAK LEAF complete products of deer hunting tree stands and accessories generally described as follows:

> Hats
> Padded Backpack Straps (PBS)
> Climbing Stick-1 Piece (CS1-1 PC)
> Climbing Stick-3 Piece (CS3-3 PC)
> Climbing Stick-4 Piece (CS4-4 PC)
> Mini Climbing Sticks (MCS1-1 PC) (MCS3-3 PC)
> Elite Hang On (EHO)
> Wide Sit & Climb Seat Only (WSCSO)
> Wide Sit & Climb Combo (WSCC)
> Alpha Hang On (AHO)
> Assault Hang On (ASHO)
> Sit & Climb Combo (SCC)
> Hand Climber-Seat Only (HCSSO)
> Hand Climber Combo (HCC)
> Stabilizer Straps for Climbers
> Ground Blinds

5.      As part of the formation of the agreement between the parties, OAK LEAF provided DDI with samples and models of the type and quality of goods to be sold.

6.      As part of DDI's agreement to sell deer hunting tree stands and accessories to OAK LEAF, it made the following affirmations of facts or promises relating to the goods that became part of the basis of the bargain:

    a. That the goods will meet the quality standards of OAK LEAF.

    b. That the goods will be of high quality product in large quantities.

    c. That the whole of the goods shall conform to the high quality and standards evident in the sample and models provided to DDI.

    d. That it understood that OAK LEAF was purchasing the goods from DDI for resale to OAK LEAF's customers and that DDI understood the specific needs and quality standards required of OAK LEAF's customers.

7.    DDI knew that OAK LEAF was in the business of selling deer hunting tree stands and accessories, both wholesale and retail, to its own customers for profit and that DDI was selling the referenced goods to OAK LEAF for its inventory for resale in its for-profit business operation.

8.    DDI knew, or should have known, that it was the only supplier or seller of the tree hunting stands and accessories to OAK LEAF in the operation of OAK LEAF's business for the year beginning 2010 and thereafter.

9.    Subsequent to September, 2009, when DDI entered into its agreement with OAK LEAF to sell the deer hunting tree stands and accessories, OAK LEAF made specific purchase orders of the deer hunting tree stands and accessories described herein in various quantities to be shipped beginning in May, 2010, and periodically thereafter.

10.    DDI breached its agreement with OAK LEAF by delivering or tendering deer hunting tree stands and accessories that were non-conforming and in a defective condition generally described on Exhibit A attached hereto and made a part hereof.

11.    The Illinois Uniform Commercial Code, 810 ILCS 5/2-714 provides for buyer's damages for breach in regards to accepted goods as follows:

**§2-714.  Buyer's Damages for Breach in Regard to Accepted Goods.**

(1) Where the buyer has accepted goods and given notification (subsection (3) of Section 2-607) he may recover as damages for any non-conformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable.

(2) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.

(3) In a proper case any incidental and consequential damages under the next section may also be recovered.

12.     Section 2-715 of the Uniform Commercial Code provides for buyer's incidental and consequential damages in regards to rejected goods as follows:

**§2-715.  Buyer's Incidental and Consequential Damages.**

(1) Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.

(2) Consequential damages resulting from the seller's breach include:

    a. Any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise…

13.     OAK LEAF provided DDI notification of its breach as to accepted goods as required under Section 2-607 of the Uniform Commercial Code.

14.     As to accepted goods, a good portion of those goods sold by OAK LEAF to its customers were returned by the customers to OAK LEAF due to their non-conforming and

defective condition.  As a result of DDI's breach, OAK LEAF suffered damages and incurred expenses required in providing additional labor in an attempt to cure; providing additional testing to determine the safety of non-conforming goods; providing tools, materials and transportation in an attempt to cure; incurred shipping and freight charges related to customer returns and attempted replacement of non-conforming goods; and storage of non-conforming and defective goods, all in excess of $100,000.00.

15.     In addition, as a result of DDI's breach, OAK LEAF was not able to fill or meet sales to its customers and its customers cancelled or returned sales due to the non-conforming and defective goods all resulting in OAK LEAF being damaged in the form of lost profit due to loss of sales, returned sales or cancelled sales to or by its own customers in an amount in excess of $1,400,000.00.

16.     Section 2-313 of the Illinois Uniform Commercial Code provides for express warranties by a seller to a buyer of goods as follows:

**§2-313.  Express Warranties by Affirmation, Promise, Description, Sample.**

(1) Express warranties by the seller are created as follows:

a.   Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

b.   Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

c.   Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

17.    DDI breached its express warranties stated in paragraph 6 above in the manner described in Exhibit A attached.

18.    As a result of DDI's breach of warranties, OAK LEAF has sustained damages exceeding $1,500,000.00.

19.    Pursuant to Section 2-717 of the Uniform Commercial Code, OAK LEAF has deducted part of its damages resulting from the breach from the price claimed due by DDI under the same contract.

WHEREFORE, the Plaintiff, OAK LEAF OUTDOORS, INC., an Illinois corporation, prays for judgment in its favor and against the Defendant, DOUBLE DRAGON INTERNATIONAL, INC., an Iowa corporation, d/b/a DDI, INC., in an amount in excess of One Million Five Hundred Thousand and no/100ths ($1,500,000.00) Dollars plus its costs.

## COUNT II
**(Breach of Implied Warranty of Merchantability, Sec. 2-314 Commercial Code)**

1-19.    For paragraphs 1 through 19 of Count II the Plaintiff, OAK LEAF, realleges and incorporates herein paragraphs 1 through 19 of Count I.

20.    Section 2-314 of the Illinois Uniform Commercial Code provides for implied warranty of merchantability by a seller to a buyer of goods as follows:

### §2-314.  Implied Warranty; Merchantability; Usage of Trade.

(1)  Unless excluded or modified (Section 2-316), a warranty that the goods shall be merchantable is implied in a contract for the sale if the seller is a merchant with respect to goods of that kind…

(2) Goods to be merchantable must be at least such as

(a)  Passed without objection in the trade under the contract description; and
***

    (c) Are fit for the ordinary purposes for which such goods are used; and

    (d) Run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved.

   (3) Unless excluded or modified (Section 2-316) other implied warranties may arise from course of dealing or usage of trade.

  21. DDI was and is a manufacturer engaged, and holding itself out as engaged, in the business of selling deer hunting tree stands and accessories and is a merchant under the Code.

  22. The sale of goods by DDI to OAK LEAF included an implied warranty of merchantability that the goods would pass without objection in the trade of seller and user of deer hunting products and accessories and further, contained an implied warranty that the goods would be fit for the ordinary purpose for which deer hunting stands and its accessories are used.

  23. DDI breached its implied warranty of merchantability in that the deer hunting tree stands and accessories were defective, non-conforming and could not pass without objection in the business of OAK LEAF's business of resale to its customers due to lack of meeting OAK LEAF's standards of quality.

  WHEREFORE, the Plaintiff, OAK LEAF OUTDOORS, INC., an Illinois corporation, prays for judgment in its favor and against the Defendant, DOUBLE DRAGON INTERNATIONAL, INC., an Iowa corporation, d/b/a DDI, INC., in an amount in excess of One Million Five Hundred Thousand and no/100ths ($1,500,000.00) Dollars plus its costs.

**COUNT III**
**(Breach of Implied Warranty of Fitness for a**
**Particular Purpose, Sec. 315 Commercial Code)**

  1-19. For paragraphs 1 through 19 of Count III the Plaintiff, OAK LEAF, realleges and incorporates herein paragraphs 1 through 19 of Count I.

20.     Section 2-315 of the Illinois Uniform Commercial Code provides for an implied warranty of fitness for a particular purpose by a seller to a buyer of goods as follows:

### §2-315. Implied Warranty: Fitness for a Particular Purpose.

> Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or to furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose.

21.     DDI at the time of contracting with OAK LEAF knew that the particular purpose for which the goods were required was the sale by OAK LEAF, both by wholesale and retail, of such goods to its wholesale and retail customers.

22.     DDI knew that the deer hunting tree stands and accessories to be sold to OAK LEAF for resale to wholesale and retail customers were of the highest quality in the industry and, further, that OAK LEAF relied on DDI's skill and judgment to select, manufacture and furnish such goods of the highest quality for resale to its own customers.

23.     DDI breached its implied warranty of fitness for a particular purpose in that the deer hunting tree stands and related accessories were non-conforming, defective, of poor quality and not of a quality or standard acceptable in the industry to OAK LEAF's wholesale and retail customers.

WHEREFORE, the Plaintiff, OAK LEAF OUTDOORS, INC., an Illinois corporation, prays for judgment in its favor and against the Defendant, DOUBLE DRAGON INTERNATIONAL, INC., an Iowa corporation, d/b/a DDI, INC., in an amount in excess of One Million Five Hundred Thousand and no/100ths ($1,500,000.00) Dollars plus its costs.

## COUNT IV
### (Fraudulent Misrepresentations)

1-10.    For paragraphs 1 through 10 of Count IV the Plaintiff, OAK LEAF, realleges and incorporates herein paragraphs 1 through 10 of Count I.

11.    Prior to and during the formation of the agreement between the parties, DDI, through its authorized agents and employees, made the following representations to OAK LEAF:

    a.    On June 23, 2009, Jim Pullen, DDI Account Executive, sent an email to OAK LEAF stating that DDI has been manufacturing products in the tree stand industry for several years so we have a pretty good grasp on this niche market.

    b.    On June 23, 2009, Jim Pullen, DDI Account Executive, sent an email to OAK LEAF containing an attachment stating that DDI would offer value to OAK LEAF in the distribution process from China through quality assurance programs outlined by the client.

    c.    On June 23, 2009, Jim Pullen, DDI Account Executive, sent an email to OAK LEAF with an attachment stating that DDI is devoted to inspect products according to the requirement expectations of our client and, further, that DDI understands the quality of its service and products directly impacts its client's productivity, competitive position and profits.

    d.    During the last week of June or first week of July, 2009, Jim Pullen and J.B. Priest met with representatives of OAK LEAF including Jared Schlipf, Michael Walston and Sally Fitzgibbons, at which time Jim Pullen and J.B. Priest made the following representations:

        i.    DDI has manufactured products in the tree stand industry for several years.

        ii.    DDI has experience in manufacturing cast aluminum components to deer hunting tree stands.

        iii.    DDI could manufacture OAK LEAF product and meet OAK LEAF's high quality standards during the first year of production due to its prior experience in China.

        iv.    DDI owns and controls its own production facilities and factories in China that will be used to manufacture Oak Leaf's products.

    v.       DDI has in place high quality assurance programs at its production facilities and factories in China, including product inspection prior to shipment, to insure DDI is able to meet the high quality standards of OAK LEAF's products.

    vi.      DDI has in place documented quality control procedures at its production facilities and factories in China to insure DDI is able to meet the high quality standards of OAK LEAF's products.

    vii.    DDI has employees at its production facilities and factories in China to insure high quality assurance programs, including product inspection prior to shipment, so as to insure DDI is able to meet the high quality standards of OAK LEAF products.

12.    The foregoing representations by DDI to OAK LEAF were false and DDI knew that the statements were false and were made with the intent to induce OAK LEAF to enter into the agreement with DDI.

13.    The foregoing representations by DDI to OAK LEAF were material and OAK LEAF relied on those representations in agreeing with DDI to allow DDI to manufacture OAK LEAF's deer hunting tree stands and accessories in China.

14.    But for the foregoing representations made by DDI to OAK LEAF, OAK LEAF would not have left its prior U.S. manufacturers and agreed with DDI to allow DDI to manufacture its products in China.

15.    DDI breached its agreement with OAK LEAF by delivering or tendering deer hunting tree stands and accessories to OAK LEAF that were non-conforming and in a defective condition.

16.    OAK LEAF has been damaged due to its reliance on the statements and representations made by DDI as follows:

    a.    OAK LEAF has suffered damages and incurred expenses in providing additional labor in an attempt to cure; providing additional testing to determine the safety of non-conforming goods; providing tools, materials and transportation in an attempt to cure; incurred shipping and freight charges related to customer returns and attempted replacement of non-conforming goods; storage of non-conforming and defective goods all in excess of $100,000.00.

    b.    OAK LEAF was not able to fill or meet sales to its customers and its customers cancelled or returned sales due to the non-conforming and defective goods all resulting in OAK LEAF being damaged in the form of lost profit due to loss of sales, returned sales, or cancelled sales, to or by its own customers in an amount in excess of $1,400,000.00.

17.    The misrepresentations of fact by DDI to OAK LEAF was a gross fraud showing malice and willfulness and was designed to enrich DDI without regard to its affect on OAK LEAF or OAK LEAF's customers and OAK LEAF is entitled to recovery of punitive damages.

WHEREFORE, the Plaintiff, OAK LEAF OUTDOORS, INC., an Illinois corporation, prays for judgment in its favor and against the Defendant, DOUBLE DRAGON INTERNATIONAL, INC., an Illinois corporation d/b/a DDI, INC., in an amount in excess of One million five hundred thousand and no/100ths ($1,500,000.00) dollars plus its costs and, further, punitive and/or exemplary damages, and for such other relief as is deemed just and proper.

## COUNT V
### (Trademark Infringement under the Lanham Act)

Proposed Count V is left blank per the court's Order of October 5, 2012. (ECF No. 273).

## COUNT VI

### (Common Law Trademark Infringement)

Proposed Count VI is left blank per the court's Order of October 5, 2012. (ECF No. 273).

**COUNT VII**
**(Unfair Competition under the Lanham Act)**

Count VII is removed per the court's Order of _____, 2012 (ECF No. ____).

**COUNT VIII**
**(Common Law Unfair Competition)**

1-10.   For paragraphs 1 through 10 of Count VIII the Plaintiff, OAK LEAF, realleges and incorporates herein paragraphs 1 through 10 of Count I.

11.     Since 2006, OAK LEAF has been in the business of advertising, promoting and selling both wholesale and retail deer hunting tree stands, climbing sticks, ground blinds and related accessories.

13.     OAK LEAF is the exclusive licensee of the United States Trademark Registration No. 2,733,871 for the LONE WOLF mark for the manufacture, advertising, promotion and sale of deer hunting tree stands, climbing sticks, ground blinds and related accessories.  A copy of the License Agreement is attached as Exhibit B.

14.     OAK LEAF d/b/a LONE WOLF enjoys a valuable reputation and has built substantial goodwill in the trade and with consumers as a provider of the highest quality deer hunting tree stands, climbing sticks, ground blinds and related accessories.  The LONE WOLF mark has come to be recognized and associated by the trade and consuming public exclusively with OAK LEAF's products and the high quality of products sold by OAK LEAF.

15.     During December, 2010, OAK LEAF rejected or returned to DDI deer hunting tree stands, climbing sticks, ground blinds and related accessories that were non-conforming and in a defective condition and, further, directed that no further products should be delivered to it.

16.     The deer hunting tree stands, climbing sticks, ground blinds and related accessories rejected or returned to DDI have the LONE WOLF mark.

17.     DDI previously requested relief from this Court asking for an Order allowing DDI to sell the LONE WOLF product in its possession, which request was adjudicated and denied by the Court.  Since this Court's denial of DDI's request to sell the LONE WOLF product in its possession, DDI has expressly stated its intention to OAK LEAF that DDI intends to sell the LONE WOLF tree stand products in its possession notwithstanding this Court's denial of DDI's previous request to sell the product.  (See Exhibit C attached).

18.     On August 16, 2012, OAK LEAF, through its attorneys, wrote DDI advising that OAK LEAF's position has remained unchanged, and that any sale or distribution of LONE WOLF products infringes OAK LEAF's exclusive right to the LONE WOLF mark.  (See Exhibit D attached).

19.     OAK LEAF has never authorized, licensed or otherwise condoned DDI's use of the LONE WOLF mark.

20.     The use by DDI of the LONE WOLF mark in connection with its sale or distribution of LONE WOLF products is likely to cause confusion or to cause a mistake, or deceive the consuming public as to the source or origin of the products.  Consumers are likely to believe that DDI's sale or distribution of the tree stand products emanate from, are operated, sponsored, authorized or approved by, or are in some other way associated with OAK LEAF.

21.     LONE WOLF is a distinctive mark, identifying OAK LEAF's deer hunting tree stands, climbing sticks and related accessories provided under the mark.

22.     DDI's use of the LONE WOLF mark as alleged herein is likely to cause confusion, to cause a mistake or to deceive consumers to the source or origin of the products.

23.     DDI's unauthorized use of the LONE WOLF mark suggests association, affiliation or sponsorship with or approval by OAK LEAF, so as to cause, or be likely to cause

confusion or mistake, or to deceive consumers as to the origin of DDI's products or services. Such use constitutes an effort to pass off product and services as originating from or approved by OAK LEAF, all to the gain of DDI and to the loss of and damage to OAK LEAF.

24.    DDI's acts as alleged herein constitute unfair competition in violation of OAK LEAF's rights under the common law in the State of Illinois.

25.    The injury to OAK LEAF is immediate and irreparable.  If DDI's acts as alleged herein are allowed, OAK LEAF will suffer irreparable injury to its goodwill and business reputation for which an award of monetary damages alone cannot fully compensate and for which OAK LEAF has no adequate remedy at law.

WHEREFORE, OAK LEAF PRAYS:

1.    That DDI and its officers, directors, agents, representatives, attorneys and all other persons acting or claiming to act on their behalf or under their direction or authority, and all persons acting in concert or in participation of DDI, be preliminarily and permanently enjoined from:

(a)    Using the LONE WOLF mark or any marks confusingly similar to, or in any other way infringing OAK LEAF's rights in and to the LONE WOLF trademark;

(b)    Otherwise taking any action likely to cause confusion, mistake or deception on the part of the public as to the connection, affiliation or other association of DDI's products or services with OAK LEAF; and

(c)    Otherwise unfairly competing with OAK LEAF.

2.    That DDI pay OAK LEAF's costs and disbursements in this action, including its reasonable attorney's fees.

3.    That OAK LEAF be awarded such other and further relief as this Court may deem just and proper.

## COUNT IX
### (Consumer Fraud and Deceptive Business Practices)

1-22.   OAK LEAF realleges and incorporates by reference, as if fully set forth herein, the allegations in paragraphs 1 through 21 of Count VIII.

23.     DDI's unauthorized use of the LONE WOLF mark is likely to mislead the consuming public as to the origin of the products and falsely represents that there is a connection between OAK LEAF and DDI.

24.     DDI's acts set forth herein constitute unfair methods of competition and unfair or deceptive acts or practices in violation of Section 505/2 of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2.

25.     The injury to OAK LEAF is immediate and irreparable.  If DDI's acts as alleged herein are allowed, OAK LEAF will suffer irreparable injury to its goodwill and business reputation for which an award of monetary damages alone cannot fully compensate and for which OAK LEAF has no adequate remedy at law.

WHEREFORE, OAK LEAF PRAYS:

1.     That DDI and its officers, directors, agents, representatives, attorneys and all other persons acting or claiming to act on their behalf or under their direction or authority, and all persons acting in concert or in participation of DDI, be preliminarily and permanently enjoined from:

    (a)     Using the LONE WOLF mark or any marks confusingly similar to, or in any other way infringing OAK LEAF's rights in and to the LONE WOLF trademark;

    (b)     Otherwise taking any action likely to cause confusion, mistake or deception on the part of the public as to the connection, affiliation or other association of DDI's products or services with OAK LEAF; and

    (c)     Otherwise unfairly competing with OAK LEAF.

2.      That DDI pay OAK LEAF's costs and disbursements in this action, including its reasonable attorney's fees.

3.      That OAK LEAF be awarded such other and further relief as this Court may deem just and proper.

**COUNT X**
**(Illinois Deceptive Trade Practices Act)**

1-22.   OAK LEAF realleges and incorporates by reference, as if fully set forth herein, the allegations in paragraphs 1 through 21 of Count VIII.

23.     DDI's unauthorized use of the LONE WOLF mark causes the likelihood of confusion or misunderstanding as to the source, sponsorship, approval or certification of the LONE WOLF products and, further, causes likelihood or confusion or misunderstanding as to affiliation, connection or association with or certification by OAK LEAF.

24.     DDI's acts as alleged herein constitute violations of Section 510/2 of the Illinois Deceptive Trade Practices Act, 815 ILCS 510/2(a).

25.     Injury to OAK LEAF is immediate and irreparable.  If DDI's acts as alleged herein are allowed, OAK LEAF will suffer irreparable injury to its goodwill and business reputation for which an award of monetary damages alone cannot fully compensate it and for which OAK LEAF has no adequate remedy at law.

WHEREFORE, OAK LEAF PRAYS:

1.      That DDI and its officers, directors, agents, representatives, attorneys and all other persons acting or claiming to act on their behalf or under their direction or authority, and all persons acting in concert or in participation of DDI, be preliminarily and permanently enjoined from:

(a) Using the LONE WOLF mark or any marks confusingly similar to, or in any other way infringing OAK LEAF's rights in and to the LONE WOLF trademark;

(b) Otherwise taking any action likely to cause confusion, mistake or deception on the part of the public as to the connection, affiliation or other association of DDI's products or services with OAK LEAF; and

(c) Otherwise unfairly competing with OAK LEAF.

2. That DDI pay OAK LEAF's costs and disbursements in this action, including its reasonable attorney's fees.

3. That OAK LEAF be awarded such other and further relief as this Court may deem just and proper.

<u>COUNT XI</u>
**(Infringement of the '035 Patent)**

1. OAK LEAF incorporates by reference all preceding paragraphs.

2. At all relevant times to this litigation, OAK LEAF is and has been the sole owner by assignment of all right, title, and interest to United States Patent No. 6,547,035 (the "'035 Patent"), titled "Ladder Module," issued April 15, 2003. (Exhibit E.)

3. OAK LEAF is entitled to sue for past, present, and future infringement of the '035 Patent.

4. DDI is in the business of manufacturing or having manufactured, offering to sell, selling or importing into the United States various OAK LEAF deer hunting tree stands and accessories. The products at issue in this litigation are non-conforming and non-merchantable goods. Therefore, OAK LEAF rejected the products when DDI attempted delivery.

5. OAK LEAF notified DDI of the various defects in the deer hunting tree stands and accessories DDI manufactured and provided to OAK LEAF, and further notified DDI that it

was prohibited from making, using, selling, offering to sell, or otherwise disposing of these products.

6.      Despite OAK LEAF's notice denying DDI's request to sell or otherwise dispose of these deer hunting tree stands and accessories, DDI continues to use, offer to sell, and to sell these products, without authority or license from OAK LEAF.

7.      DDI's continued use, offer to sell, and sale of these deer hunting tree stands and accessories infringes the '035 Patent in violation of 35 U.S.C. § 271(a).

8.      Based on DDI's business relationship with OAK LEAF, DDI had knowledge of the '035 Patent, had knowledge of its infringement of the '035 Patent, and was objectively reckless in continuing its infringing activity.

9.      DDI has been and still is actively inducing others to infringe the '035 Patent in violation of 35 U.S.C. § 271(b), including but not limited to actively attempting to sell the aforementioned products to third parties without license or consent from OAK LEAF.

10.     DDI's continued infringement of the '035 Patent has damaged and will continue to damage OAK LEAF.

11.     DDI's infringement of the '035 Patent has caused OAK LEAF irreparable harm, and unless and until DDI is enjoined by this Court, OAK LEAF will continue to suffer irreparable damage and injury for which it has no adequate remedy at law.

WHEREFORE, OAK LEAF respectfully requests the following relief:

1.      Judgment that DDI has infringed and actively induced others to infringe the '035 Patent;

2.      A permanent injunction enjoining DDI, its officers, employees, agents, and all others acting in concert with it or participating with it from further infringement and/or inducement of infringement of the '035 Patent;

3.      An award of damages adequate to compensate OAK LEAF for DDI's infringement, but in no event less than a reasonable royalty under 35 U.S.C. § 284;

4.      Enter an order awarding OAK LEAF interest on the damages awarded and its costs pursuant to 35 U.S.C. § 284;

5.      Enter an order finding that this is an exceptional case and awarding OAK LEAF its reasonable costs, expenses, and reasonable attorneys' fees pursuant to 35 U.S.C. § 285; and

6.      Award such other relief as the Court may deem appropriate and just under the circumstances.

## COUNT XII
### (Infringement of the '442 Patent)

1.      OAK LEAF incorporates by reference all preceding paragraphs.

2.      At all relevant times to this litigation, OAK LEAF is and has been the sole owner by assignment of all right, title, and interest to United States Patent No. 7,371,442 (the "'442 Patent"), titled "Artificial Foliage," issued May 13, 2008.  (Exhibit F.)

3.      OAK LEAF is entitled to sue for past, present, and future infringement of the '442 Patent.

4.      DDI is in the business of manufacturing or having manufactured, offering to sell, selling or importing into the United States various OAK LEAF deer hunting tree stands and accessories.  The products at issue in this litigation are non-conforming and non-merchantable goods.  Therefore, OAK LEAF rejected the products when DDI attempted delivery.

5.      OAK LEAF notified DDI of the various defects in the deer hunting tree stands and accessories DDI manufactured and provided to OAK LEAF, and further notified DDI that it was prohibited from making, using, selling, offering to sell, or otherwise disposing of these products.

6.      Despite OAK LEAF's notice denying DDI's request to sell or otherwise dispose of these deer hunting tree stands and accessories, DDI continues to use, offer to sell, and to sell these products, without authority or license from OAK LEAF.

7.      DDI's continued use, offer to sell, and sale of these deer hunting tree stands and accessories infringes the '442 Patent in violation of 35 U.S.C. § 271(a).

8.      Based on DDI's business relationship with OAK LEAF, DDI had knowledge of the '442 Patent, had knowledge of its infringement of the '442 Patent, and was objectively reckless in continuing its infringing activity.

9.      DDI has been and still is actively inducing others to infringe the '442 Patent in violation of 35 U.S.C. § 271(b), including but not limited to actively attempting to sell the aforementioned products to third parties without license or consent from OAK LEAF.

10.     DDI's continued infringement of the '442 Patent has damaged and will continue to damage OAK LEAF.

11.     DDI's infringement of the '442 Patent has caused OAK LEAF irreparable harm, and unless and until DDI is enjoined by this Court, OAK LEAF will continue to suffer irreparable damage and injury for which it has no adequate remedy at law.

WHEREFORE, OAK LEAF respectfully requests the following relief:

1.      Judgment that DDI has infringed and actively induced others to infringe the '442 Patent;

2.    A permanent injunction enjoining DDI, its officers, employees, agents, and all others acting in concert with it or participating with it from further infringement and/or inducement of infringement of the '442 Patent;

3.    An award of damages adequate to compensate OAK LEAF for DDI's infringement, but in no event less than a reasonable royalty under 35 U.S.C. § 284;

4.    Enter an order awarding OAK LEAF interest on the damages awarded and its costs pursuant to 35 U.S.C. § 284;

5.    Enter an order finding that this is an exceptional case and awarding OAK LEAF its reasonable costs, expenses, and reasonable attorneys' fees pursuant to 35 U.S.C. § 285; and

6.    Award such other relief as the Court may deem appropriate and just under the circumstances.

## COUNT XIII
### (Infringement of the '931 Patent)

1.    OAK LEAF incorporates by reference all preceding paragraphs.

2.    At all relevant times to this litigation, OAK LEAF is and has been the sole owner by assignment of all right, title, and interest to United States Patent No. 7,882,931 (the "'931 Patent"), titled "Offset Treestand Mounting Bracket," issued February 8, 2011.  (Exhibit G.)

3.    OAK LEAF is entitled to sue for past, present, and future infringement of the '931 Patent.

4.    DDI is in the business of manufacturing or having manufactured, offering to sell, selling or importing into the United States various OAK LEAF deer hunting tree stands and accessories.  The products at issue in this litigation are non-conforming and non-merchantable goods.  Therefore, OAK LEAF rejected the products when DDI attempted delivery.

5.     OAK LEAF notified DDI of the various defects in the deer hunting tree stands and accessories DDI manufactured and provided to OAK LEAF, and further notified DDI that it was prohibited from making, using, selling, offering to sell, or otherwise disposing of these products.

6.     Despite OAK LEAF's notice denying DDI's request to sell or otherwise dispose of these deer hunting tree stands and accessories, DDI continues to use, offer to sell, and to sell these products, without authority or license from OAK LEAF.

7.     DDI's continued use, offer to sell, and sale of these deer hunting tree stands and accessories infringes the '931 Patent in violation of 35 U.S.C. § 271(a).

8.     Based on DDI's business relationship with OAK LEAF, DDI had knowledge of the '931 Patent, had knowledge of its infringement of the '931Patent, and was objectively reckless in continuing its infringing activity.

9.     DDI has been and still is actively inducing others to infringe the '931 Patent in violation of 35 U.S.C. § 271(b), including but not limited to actively attempting to sell the aforementioned products to third parties without license or consent from OAK LEAF.

10.     DDI's continued infringement of the '931Patent has damaged and will continue to damage OAK LEAF.

11.     DDI's infringement of the '931 Patent has caused OAK LEAF irreparable harm, and unless and until DDI is enjoined by this Court, OAK LEAF will continue to suffer irreparable damage and injury for which it has no adequate remedy at law.

WHEREFORE, OAK LEAF respectfully requests the following relief:

1.     Judgment that DDI has infringed and actively induced others to infringe the '931 Patent;

2.      A permanent injunction enjoining DDI, its officers, employees, agents, and all others acting in concert with it or participating with it from further infringement and/or inducement of infringement of the '931Patent;

3.      An award of damages adequate to compensate OAK LEAF for DDI's infringement, but in no event less than a reasonable royalty under 35 U.S.C. § 284;

4.      Enter an order awarding OAK LEAF interest on the damages awarded and its costs pursuant to 35 U.S.C. § 284;

5.      Enter an order finding that this is an exceptional case and awarding OAK LEAF its reasonable costs, expenses, and reasonable attorneys' fees pursuant to 35 U.S.C. § 285; and

6.      Award such other relief as the Court may deem appropriate and just under the circumstances.

## COUNT XIV
### (Infringement of the '022 Patent)

1.      OAK LEAF incorporates by reference all preceding paragraphs.

2.      At all relevant times to this litigation, OAK LEAF is and has been the sole owner by assignment of all right, title, and interest to United States Patent No. 8,066,022 (the "'022 Patent"), titled "Portable Blind and Concealment System," issued November 29, 2011.  (Exhibit H.)

3.      OAK LEAF is entitled to sue for past, present, and future infringement of the '022 Patent.

4.      DDI is in the business of manufacturing or having manufactured, offering to sell, selling or importing into the United States various OAK LEAF deer hunting tree stands and

accessories. The products at issue in this litigation are non-conforming and non-merchantable goods. Therefore, OAK LEAF rejected the products when DDI attempted delivery.

5. OAK LEAF notified DDI of the various defects in the deer hunting tree stands and accessories DDI manufactured and provided to OAK LEAF, and further notified DDI that it was prohibited from making, using, selling, offering to sell, or otherwise disposing of these products.

6. Despite OAK LEAF's notice denying DDI's request to sell or otherwise dispose of these deer hunting tree stands and accessories, DDI continues to use, offer to sell, and to sell these products, without authority or license from OAK LEAF.

7. DDI's continued use, offer to sell, and sale of these deer hunting tree stands and accessories infringes the '022 Patent in violation of 35 U.S.C. § 271(a).

8. Based on DDI's business relationship with OAK LEAF, DDI had knowledge of the '022 Patent, had knowledge of its infringement of the '022 Patent, and was objectively reckless in continuing its infringing activity.

9. DDI has been and still is actively inducing others to infringe the '022 Patent in violation of 35 U.S.C. § 271(b), including but not limited to actively attempting to sell the aforementioned products to third parties without license or consent from OAK LEAF.

10. DDI's continued infringement of the '022 Patent has damaged and will continue to damage OAK LEAF.

11. DDI's infringement of the '022 Patent has caused OAK LEAF irreparable harm, and unless and until DDI is enjoined by this Court, OAK LEAF will continue to suffer irreparable damage and injury for which it has no adequate remedy at law.

WHEREFORE, OAK LEAF respectfully requests the following relief:

1.      Judgment that DDI has infringed and actively induced others to infringe the '022 Patent;

2.      A permanent injunction enjoining DDI, its officers, employees, agents, and all others acting in concert with it or participating with it from further infringement and/or inducement of infringement of the '022 Patent;

3.      An award of damages adequate to compensate OAK LEAF for DDI's infringement, but in no event less than a reasonable royalty under 35 U.S.C. § 284;

4.      Enter an order awarding OAK LEAF interest on the damages awarded and its costs pursuant to 35 U.S.C. § 284;

5.      Enter an order finding that this is an exceptional case and awarding OAK LEAF its reasonable costs, expenses, and reasonable attorneys' fees pursuant to 35 U.S.C. § 285; and

6.      Award such other relief as the Court may deem appropriate and just under the circumstances.

## COUNT XV
### (Infringement of the '201 Patent)

1.      OAK LEAF incorporates by reference all preceding paragraphs.

2.      At all relevant times to this litigation, OAK LEAF is and has been the sole owner by assignment of all right, title, and interest to United States Design Patent No. D445,201 (the "'201 Patent"), titled "Tree Stand Platform," issued July 17, 2001.  (Exhibit I.)

3.      OAK LEAF is entitled to sue for past, present, and future infringement of the '201 Patent.

4.      DDI is in the business of manufacturing or having manufactured, offering to sell, selling or importing into the United States various OAK LEAF deer hunting tree stands and

accessories. The products at issue in this litigation are non-conforming and non-merchantable goods. Therefore, OAK LEAF rejected the products when DDI attempted delivery.

5.     OAK LEAF notified DDI of the various defects in the deer hunting tree stands and accessories DDI manufactured and provided to OAK LEAF, and further notified DDI that it was prohibited from making, using, selling, offering to sell, or otherwise disposing of these products.

6.     Despite OAK LEAF's notice denying DDI's request to sell or otherwise dispose of these deer hunting tree stands and accessories, DDI continues to use, offer to sell, and to sell these products, without authority or license from OAK LEAF.

7.     DDI's continued use, offer to sell, and sale of these deer hunting tree stands and accessories infringes the '201 Patent in violation of 35 U.S.C. § 271(a).

8.     Based on DDI's business relationship with OAK LEAF, DDI had knowledge of the '201 Patent, had knowledge of its infringement of the '201 Patent, and was objectively reckless in continuing its infringing activity.

9.     DDI has been and still is actively inducing others to infringe the '201 Patent in violation of 35 U.S.C. § 271(b), including but not limited to actively attempting to sell the aforementioned products to third parties without license or consent from OAK LEAF.

10.    DDI's continued infringement of the '201 Patent has damaged and will continue to damage OAK LEAF.

11.    DDI's infringement of the '201 Patent has caused OAK LEAF irreparable harm, and unless and until DDI is enjoined by this Court, OAK LEAF will continue to suffer irreparable damage and injury for which it has no adequate remedy at law.

WHEREFORE, OAK LEAF respectfully requests the following relief:

1.      Judgment that DDI has infringed and actively induced others to infringe the '201 Patent;

2.      A permanent injunction enjoining DDI, its officers, employees, agents, and all others acting in concert with it or participating with it from further infringement and/or inducement of infringement of the '201 Patent;

3.      An award of damages adequate to compensate OAK LEAF for DDI's infringement, but in no event less than a reasonable royalty under 35 U.S.C. § 284;

4.      Enter an order awarding OAK LEAF interest on the damages awarded and its costs pursuant to 35 U.S.C. § 284;

5.      Enter an order finding that this is an exceptional case and awarding OAK LEAF its reasonable costs, expenses, and reasonable attorneys' fees pursuant to 35 U.S.C. § 285; and

6.      Award such other relief as the Court may deem appropriate and just under the circumstances.

## JURY DEMAND

OAK LEAF hereby demands trial by jury for all issues so triable.


Dated: October 12, 2012              /s/ Janet L. Ramsey
                                     Janet L. Ramsey
                                     WARNER NORCROSS & JUDD LLP
                                     900 Fifth Third Center
                                     111 Lyon Street, N.W.
                                     Grand Rapids, Michigan 49503-2487
                                     616.752.2000

                                     Timothy J. Cassidy
                                     CASSIDY & MUELLER, P.C.
                                     416 Main Street, Suite 323
                                     Peoria, IL  61602
                                     309.676.0591

*Attorneys for Oak Leaf Outdoors, Inc.*

**Oak Leaf Outdoors, Inc. v. Double Dragon International, Inc.**
**USDC-CD Ill. No. 11-1175**

**CERTIFICATE OF SERVICE**

I hereby certify that on October 12, 2012, I electronically filed the above pleading with the Clerk of the Court using the CM/ECF system which will send notification of such filing(s) to the following:

> H. Patrick Morris - morrisp@jbltd.com
> David Fanning - fanningd@jbltd.com
> Joshua Strom - jbstrom@rkmc.com
> Christopher W. Madel - cwmadel@rkmc.com
> Michael Collyard - macollyard@rkmc.com
> David Lubben - dglubben@dcamplaw.com

> Respectfully submitted,

> /s/ Janet L. Ramsey _____
> Janet L. Ramsey
> WARNER NORCROSS & JUDD LLP
> 900 Fifth Third Center
> 111 Lyon Street, N.W.
> Grand Rapids, Michigan 49503-2487
> 616.752.2000

> Timothy J. Cassidy
> CASSIDY & MUELLER, P.C.
> 416 Main Street, Suite 323
> Peoria, IL 61602
> 309.676.0591

> *Attorneys for Oak Leaf Outdoors, Inc.*

8654833-2

# EXHIBIT A

Lone Wolf Portable Tree Stands
2010
Defective Product List

Product    Problems with unit

AHO    Pitting in castings (seat & base)
       Cracks in castings (seat & base)
       Warped Castings (seat & Base)
       Welds and excessive grinding marks (seat & base)
       Seat cushions wrong thickness
       Leveler button loose or missing
       Post assembly sets crooked
       Teeth on base inconsistent in thickness

ASHO   Pitting in castings (seat & base)
       Cracks in castings (seat & base)
       Warped Castings (seat & Base)
       Welds and excessive grinding marks (seat & base)
       Seat cushions wrong thickness
       Leveler button loose
       Post assembly sets crooked

EHO    Pitting in castings (seat & base)
       Cracks in castings (seat & base)
       Warped Castings (seat & Base)
       Welds and excessive grinding marks (seat & base)
       Seat cushions wrong thickness
       Leveler button loose
       Post assembly sets crooked
       Teeth on base inconsistent in thickness

SCC    Grind marks and welds on castings
       Cracks in castings
       Pitting in castings
       Warped castings
       Bolts in upside down on tree lock
       Spot face not milled deep enough
       Arms not consistant in length
       Cams don't close properly
       Seat buckles on backwards
       Stabilizer buckles breaking
       Hinge arms inconsistent in length
       missing washers
       missing end caps

EXHIBIT   B

No. 8322    p. 7

Dec. 10. 2010 12:43PM

Lone Wolf Portable Tree Stands
2010
Defective Product List

WSCC    Grind marks and welds on castings
        Cracks in castings
        Pitting in castings
        Warped castings
        Bolts in upside down on tree lock
        Spot face not milled deep enough
        Arms not consistant in length
        Cams don't close properly
        Seat buckles on backwards
        Stabilizer buckles breaking
        Hinge arms inconsistant in length

HCC     Warped castings(seat & base)
        Welds & excessive grind marks (base & seat)
        Cams don't close properly
        Stabilizing buckles breaking
        Spot face not milled deep enough
        Inconsistant arm length
        Hinge arms inconsistant in length
        Color inconsistant

SACSO   Buckles backwards
        Spot face not milled deep enough
        Cams don't close properly
        Hinge arms not consistant in length
        Bolts upside down on tree lock

WSCSO   Buckles backwards
        Spot face not milled deep enough
        Cams don't open properly
        Hinge arms not consistant in length
        Bolts upside down on tree lock
        missing end caps

CS1-1PC   Wrong color
          Bolts bending
          Washers cracking
          V-brackets breaking
          Bolts inconsistant in length
          missing middle step

CS3-3PC   Wrong color
          Bolts bending
          Washers cracking
          V-brackets breaking
          Bolts inconsistant in length
          missing middle step

Lone Wolf Portable Tree Stands
2010
Defective Product List

CS4-4PC   Wrong color
          Bolts bending
          Washers cracking
          V-brackets breaking
          Bolts inconsistent in length
          missing middle step

PBS       Straps sewn wrong

HCSSO     Warped castings
          Grind marks & welds
          Cams don't close properly
          Color inconsistent

CamoFlex  Poor stitching quality
Blind     Camo Stars breaking
          Branches breaking
          Brush loops not sewn with PU backing

# EXHIBIT B

## LICENSE AGREEMENT

THIS LICENSE AGREEMENT (the "Agreement") is made and entered into effective the _9th_ day of _June_, 2006, by and between, Andre T. D'Acquisto, a Wisconsin resident, and Lone Wolf Manufacturing Company, Inc., a Wisconsin corporation with a principal office at 5411 South 9th Street, Milwaukee, WI 53221 (collectively "LICENSOR") and Weaver Enterprises, Ltd., a Nevada corporation with an Illinois office at c/o Jerry Weaver, 5806 W. Route 150, Peoria, Illinois 61612 ("LICENSEE").

## WITNESSETH:

(A)  WHEREAS, LICENSOR owns the trademark LONE WOLF® and a corresponding U.S. Federal Trademark Registration No. 2,733,871 ("Licensed Trademark"); and

(B)  WHEREAS, LICENSEE desires the right to use the Licensed Trademark exclusively in connection with the manufacture, sales, advertising and promotion of tree stands, climbing sticks, and other tree stand accessories defined as Category I Products in an accompanying Consulting Agreement to be separately executed between the LICENSOR and LICENSEE and as listed in Exhibit A attached to this Agreement, ("Category I and Exhibit A Products") and non-exclusively in connection with the manufacture, sales, advertising and promotion of other products defined as Category II and III Products in the accompanying Consulting Agreement ("Category II and III Products") each solely within the Continental United States and Canada ("Licensed Territory").

(C)  WHEREAS, LICENSEE recognizes that the Licensed Trademarks have acquired some notoriety and goodwill with the general public and desires to obtain a right to use the Licensed Trademark exclusively in connection with the Category I and Exhibit A Products and non-exclusively in connection with the Category II and III Products; and

(D)  WHEREAS, LICENSOR is willing to grant to LICENSEE a License under the terms and conditions specifically set forth herein;

NOW, THEREFORE, in consideration of the mutual covenants, undertakings, and premises contained herein, and other good and valuable consideration, the receipt of which the parties hereby acknowledge, it is hereby agreed to as follows:

## LICENSE

1.  Subject to the terms and conditions set forth herein, LICENSOR hereby grants to LICENSEE and LICENSEE hereby accepts the exclusive, non-transferable, and non-assignable right to use the Licensed Trademark during the Licensed Term in the Licensed Territory in connection with the manufacturing, advertising, promotion, and sale of the Category I and Exhibit A Products, and the non-exclusive, non-transferable, and non-assignable right to use the Licensed Trademark during the Licensed Term in the Licensed Territory in connection with the manufacturing, advertising, promotion, and sale of the Category II and III Products. No license is granted hereunder for the use of the Licensed Trademarks for any other purpose. Further, the

rights granted by the above licenses are non-sublicenseable, except to a company that is wholly owned and controlled by one or more of the following individuals: Jerry Weaver, Nancy Weaver, Jeff Weaver, or Jared Schlipf, whom are each principals of LICENSEE.

## QUALITY, INSPECTION AND APPROVAL

2.1.    LICENSEE represents and warrants that it will maintain the quality of Category I and Exhibit A Products and Category II and III Products at least at a level that meets industry standards and is commensurate with the quality of product previously manufactured and sold by LICENSOR.

2.2.    LICENSEE represents and warrants that it will comply with all applicable laws, rules and regulations relating to the production, promotion, and sale of Category I and Exhibit A Products and Category II and III Products and will not violate or infringe any right of any third party.

2.3.    LICENSEE agrees that the nature and quality of all Category I and Exhibit A Products and Category II and III Products in connection with the Licensed Trademarks shall conform to the standards set by LICENSOR.  LICENSOR shall have the sole right and discretion to determine whether the Licensed Products are of satisfactory quality.

2.4.    LICENSEE shall on request provide to LICENSOR representative samples of the Category I and Exhibit A Products and Category II and III Products, and LICENSOR or its authorized representatives shall have the right to inspect LICENSEE'S business operations conducted in connection with the Licensed Trademark.

## TRADEMARK USAGE

3.1.    LICENSEE agrees that the manner of use and display of the Licensed Trademarks shall conform to the standards agreed upon by LICENSOR and such agreement by LICENSOR shall not be unreasonably withheld.

3.2    LICENSEE shall include all notices, markings and legends as are or may be required by applicable law or by LICENSOR in order to give appropriate notice of trademark rights.

## TRADEMARK OWNERSHIP

4.1.    LICENSEE acknowledges and agrees that the Licensed Trademark, all goodwill associated therewith, and all registrations thereof are owned solely by LICENSOR and LICENSEE shall never directly or indirectly contest the ownership or validity of the trademark.

4.2.    All use of the Licensed Trademark shall inure solely to the benefit of and be on behalf of LICENSOR;

4.3.    The License granted herein is not intended to be and shall not be construed as an Assignment; and, further, nothing herein confers on LICENSEE any right, title or interest in the Licensed Trademark other than the limited right to use same in accordance with this Agreement;

4.4.    LICENSEE shall not do or cause to be done, or omit to do or be done, anything impairing or intending to impair any of the rights of LICENSOR in the Licensed Trademark;

4.5.    LICENSOR retains the right to use or license the use of the Licensed Trademark for any business, goods or services except as expressly provided for in this Agreement.

## RESTRICTIONS ON LICENSEE

5.    LICENSOR grants no rights other than those expressly granted herein. LICENSEE agrees that it shall not directly or indirectly:

5.1.    Use any of the Licensed Trademarks for any business, goods or services other than the Licensed Products;

5.2.    Use any of LICENSOR'S trade names, trademarks, service marks, domain names or trade dress, other than the Licensed Trademark;

5.3.    Apply to register or own any registration of any of the Licensed Trademarks or any trademarks confusingly similar thereto anywhere in the world;

5.4.    Assign or transfer this Agreement or any portion thereof, this License Agreement being personal to LICENSEE;

5.5.    Use the Licensed Trademarks in a manner that may derogate, interfere or diminish LICENSOR'S rights in the Licensed Trademarks, or in any other manner adverse to LICENSOR;

5.6    Sublicense or permit any third party to use any of the Licensed Trademarks unless otherwise expressly provided for herein.

## INFRINGEMENT

6.    LICENSEE shall promptly notify LICENSOR of any suspected infringement of or challenge to the Licensed Trademark. LICENSOR shall have the right in its sole discretion to decide what, if any, action to take and whether to institute and prosecute any actions or proceedings. LICENSOR may, at its option, commence, prosecute or defend any action or claim concerning the Licensed Trademark in the name of LICENSOR or LICENSEE or join LICENSEE as a party thereto. LICENSOR shall have the right to control any such litigation. The burden of expenses shall be borne by and the benefit of any award shall accrue to LICENSOR. LICENSEE shall cooperate with LICENSOR in any such action.

## PAYMENTS AND REPORTS

7.1    In consideration of the exclusive License granted hereunder for Category I and Exhibit A Products, LICENSEE shall pay to LICENSOR contemporaneously with the closing of an Asset Purchase Agreement to be separately executed between LICENSOR and LICENSEE, a one-time, non-refundable, royalty payment of four hundred thousand dollars ($400,000.00).

7.2    In consideration of the non-exclusive License granted hereunder for Category II and III Products, LICENSEE shall pay to LICENSOR a royalty of Fifteen percent (15%) of all LICENSEE'S "Net Sales" (defined as gross sales after retail sales taxes have been deducted) of Category II and III Products, as stated in the Consulting Agreement concerning the manufacture and sale of Category II and III Products.  Royalty payments shall be accounted for and paid to LICENSOR based on LICENSEE'S sales during each calendar quarter throughout the Licensed Term and during the Sell-Off Period (if any, pursuant to paragraph 9.3 below). Earned Royalties shall be paid to LICENSOR within thirty (30) days following the end of each calendar quarter during the Licensed Term.

7.3    If LICENSEE fails to make any Royalty or other payment due under this Agreement on the date such payment is due, then, without prejudice to any other rights or remedies that LICENSOR may have against LICENSEE, LICENSEE shall pay interest on the deficiency of the amount due at an annual rate of 6%.  Such interest shall accrue as of the day such deficiency in payment arose until the date such amount is paid in full.

7.4    Within thirty (30) days following the close of each calendar quarter throughout the Licensed Term and concurrently with the remittance of the payments required pursuant to this Agreement, LICENSEE shall submit to LICENSOR a written report, relating to and including a calculation of the Net Sales made by LICENSEE during said quarter which shall include a breakdown of sales by product. Licensor shall have the right at reasonable hours and during reasonable times, with advance notice to Licensee, to inspect Licensee's books and records to ensure compliance with this provision.

## TERM AND TERMINATION

8.1    For the exclusive license concerning the Category I and Exhibit A Products, this agreement shall be effective beginning on the effective date and shall last for the entire term of the Licensed Trademark, except as provided for in Sections 2.1-2.4.

8.2.    For the non-exclusive license concerning the Category II and III Products, this Agreement shall be effective beginning on the Effective Date and shall have an initial term ending on December 31, 2006, unless sooner terminated in accordance with its terms. Thereafter, this Agreement shall automatically renew for successive one year periods if all royalties are timely paid, unless either notifies the other in writing at least ninety (90) days prior to the expiration date of its intention not to renew.  The initial term and any and all renewal terms shall be referred to as the "Term."

8.3.   LICENSOR may terminate the non-exclusive portion of this Agreement concerning the Category II and III Products: (i) if LICENSEE fails to cure its breach of this Agreement within thirty (30) days notice of breach; or immediately if: (ii) LICENSEE acts in any manner that could unreasonably injure, limit or otherwise effect LICENSOR or LICENSOR'S ownership of the Licensed Trademark.

8.4.   Upon termination of the non-exclusive portion of this Agreement concerning the Category II and III Products, LICENSEE agrees to immediately discontinue all use of any of the Licensed Trademarks, and any term(s) confusingly similar thereto, to cease all promotion, sales and/or distribution of the Category II and III Products bearing the Licensed Trademark, and to destroy all printed materials bearing the Licensed Trademark.

## REPRESENTATIONS, WARRANTIES, INDEMNIFICATION

9.1   Each party represents and warrants that it has the power, authority and right to enter into this Agreement and to perform its obligations hereunder.

9.2   **LICENSOR MAKES NO WARRANTY, EXPRESS OR IMPLIED. IN NO EVENT SHALL LICENSOR BE LIABLE FOR ANY INCIDENTAL, SPECIAL, PUNITIVE, CONSEQUENTIAL OR INDIRECT DAMAGES (INCLUDING, BUT NOT LIMITED TO, DAMAGES FOR LOSS OF BUSINESS PROFITS), EVEN IF LICENSOR HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT.**

9.3   LICENSEE acknowledges and agrees that LICENSOR, and its affiliates, as a result of LICENSOR'S execution of this Agreement, assume no duty or responsibility and consequently have no liability to LICENSEE or any third party with respect to any product liability, personal injury or other similar claim arising from or relating to the Licensed Products made, sold, provided, distributed or otherwise exploited by LICENSEE. LICENSEE agrees to defend and indemnify LICENSOR against any such claims.

## INDEPENDENT CONTRACTORS

10.   LICENSOR and LICENSEE agree that each acts as an independent contractor, and neither party is granted any authority to create any obligation, express or implied, on behalf of the other party or to bind the other party in any manner. Neither party shall be deemed the agent, employee, partner or joint venture partner of the other.

## SEVERABILITY

11.   If any provision of this Agreement is declared by a court of competent jurisdiction to be invalid, void or unenforceable, the remaining provisions of this Agreement nevertheless will continue in full force and effect without being impaired or invalidated in any way.

### ENTIRE AGREEMENT; WAIVER

12.    This Agreement, constitutes the entire understanding and agreement of the parties hereto with respect to the specific subject matter of this Agreement, and supersedes all prior agreements or understandings, written or oral, between the parties hereto with respect to the specific subject matter of this Agreement. This Agreement may not be amended except by a written instrument signed by the parties hereto. A waiver of any term or condition will not be deemed a waiver of any such term or condition in the future, unless such change or modification or waiver shall be in writing and physically signed by the parties sought to be charged with charge, modification or waiver.

### APPLICABLE LAW

13.    This Agreement shall be governed by, and construed and enforced in accordance with, the Federal Laws of the United States and the laws of the State of Wisconsin without regard to any choice of law provisions therefore. LICENSEE hereby consents to the personal jurisdiction in the Federal Courts of the United States and the courts of the State of Wisconsin. The exclusive venue for any action arising from, related to or brought to enforce this Agreement shall be the State or Federal Courts located in Wisconsin.

### NOTICE

14.    Any notice required or permitted under this Agreement shall be in writing and shall be deemed given if delivered personally, mailed by registered or certified mail, return-receipt requested, or sent by telefax with a confirming receipt, to the parties at the addresses provided on the first page of this Agreement or to such other addresses as the parties notify each other in writing are to be used, with copies to the individuals listed below:

If to LICENSOR:

> Mathew E. Corr
> Boyle, Fredrickson, Newholm, Stein & Gratz, S.C.
> 250 Wisconsin Avenue
> Suite 1030
> Milwaukee, Wisconsin 53202

If to LICENSEE:

> Timothy Cassidy
> Cassidy & Mueller
> Commerce Bank Building
> Suite 323
> 416 Main Street
> Peoria, Illinois 61602

{C0101841.DOC /}                 6 of 9

## SECTIONS

15.    Section headings are used in this Agreement for convenience of reference only and shall not affect the meaning of any provision of this Agreement.

## COUNTERPARTS

16.    This Agreement may be executed in one or more counterparts, each of which shall be deemed and original and all of which shall be taken together and deemed to be one instrument.

IN WITNESS WHEREOF, the parties have executed this Agreement, in duplicate, through their representatives listed below:

_____
Andre T. D'Acquisto/Lone Wolf Mfg. Co., Inc

Date: _____7-13-06_____

_____
Weaver Enterprises, Ltd

Date: _____6/9/06_____

EXHIBIT A

1. TMA Hand Climber

2. TMA Hang on Stand

3. TMA Sit and Climb Combo

4. All Climbing Sticks

5. Climbing Stick Caddy

6. Alpha Sit and Climb Seat

7. Assault Hang on Stand

8. Alpha Hand Climber Seat

9. Foot Rests

10. Padded Sit and Climb Seat Kit

11. Full Arrest System (harness)

12. Foam Seat

13. Bow Gun Tow Rope

14. Padded Back Pack Straps

15. Bow Holder Grommet

16. Gun Holder Grommet

17. Replacement Belt Stands, Sticks, & Extensions

18. Stabilizer Straps

19. Bungee Stands & Sticks

20. Easy Hang Nook

21. Stand & Hinge Knobs

22. Replacement Traction Belts

23. Seat Kit Hang on Stand

24. Hats and T-shirts with Lone Wolf Portable Tree Stands logo

24.

**E-FILED**
Wednesday, 29 August, 2012  11:43:57 AM
Clerk, U.S. District Court, ILCD

# EXHIBIT B

# ROBINS, KAPLAN, MILLER & CIRESI L.L.P.

2800 LASALLE PLAZA
800 LASALLE AVENUE
MINNEAPOLIS, MN 55402-2015
TEL: 612-349-8500 FAX: 612-339-4181
www.rkmc.com

ATTORNEYS AT LAW

Michael A. Collyard
MACollyard@rkmc.com
612-349-0975

August 16, 2012                                            *By e-mail*

Timothy J. Cassidy
CASSIDY & MUELLER
416 Main Street, Suite 323
Peoria, IL 61602

David G. Lubben
Davis & Campbell L.L.C.
401 Main Street, Suite 1600
Peoria, IL 61602

  Re: *Oak Leaf Outdoors, Inc. v. Double Dragon International, Inc.*

Dear Tim and David:

As a professional courtesy, I want to inform you that DDI intends to mitigate its
damages by selling the repossessed and diverted tree-stand products that were
manufactured for Oak Leaf. Given that Oak Leaf appears to be on the verge of
bankruptcy, DDI believes that selling this product is the best way to protect its
interests.

If you have questions or wish to discuss, please call.

       Sincerely,

       Michael A. Collyard

83299815.1

ATLANTA · BOSTON · LOS ANGELES · MINNEAPOLIS · NAPLES

E-FILED
Wednesday, 29 August, 2012  11:43:57 AM
Clerk, U.S. District Court, ILCD

# EXHIBIT C

## Tim Cassidy

| | |
|---|---|
| **From:** | Tim Cassidy |
| **Sent:** | Thursday, August 16, 2012 11:58 AM |
| **To:** | Collyard, Michael A. (MACollyard@rkmc.com) |
| **Cc:** | David Lubben (dglubben@dcamplaw.com) |
| **Subject:** | FW: Oak Leaf Outdoors, Inc. v. Double Dragon International, Inc. |
| **Attachments:** | 2012-08-16 Letter to Cassidy and Lubben.PDF |

Mike

This is to acknowledge receipt of your letter advising DDI intends to sell "repossessed" and "diverted" product. The product was returned and rejected by Oak Leaf as defective and our position remains unchanged – any such action will result in claims against your client under theories previously stated. Also, the court denied DDI's Motion for Relief, essentially finding the product could not be sold due to my clients intellectual property rights and your clients action would be in violation of the court order denying the Motion. We intend to file an emergency Motion for Protective Order.

Tim Cassidy

**From:** Foster, Teresa M. [mailto:TMFoster@rkmc.com]
**Sent:** Thursday, August 16, 2012 10:49 AM
**To:** Tim Cassidy; David Lubben <dglubben@dcamplaw.com> (dglubben@dcamplaw.com)
**Cc:** Collyard, Michael A.; Strom, Joshua B.
**Subject:** Oak Leaf Outdoors, Inc. v. Double Dragon International, Inc.

Mr. Cassidy and Mr. Lubben,

Please see attached correspondence from Michael A. Collyard.


Teresa Foster
Legal Administrative Assistant
**Robins, Kaplan, Miller & Ciresi L.L.P.**
800 LaSalle Avenue | 2800 LaSalle Plaza | Minneapolis, MN 55402
Direct: 612.349.0851 | Fax: 612.339.4181
tmfoster@rkmc.com | www.rkmc.com

Information contained in this e-mail transmission may be privileged, confidential and covered by the Electronic Communications Privacy Act, 18 U.S.C. Sections 2510-2521.

If you are not the intended recipient, do not read, distribute, or reproduce this transmission.

If you have received this e-mail transmission in error, please notify us immediately of the error by return email and please delete the message from your system.

Pursuant to requirements related to practice before the U. S. Internal Revenue Service, any tax advice contained in this communication (including any attachments) is not intended to be used, and cannot be used, for purposes

1

E-FILED
Tuesday, 09 October, 2012 03:04:03 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT D

**Tim Cassidy**

| | |
|---|---|
| From: | Tim Cassidy |
| Sent: | Thursday, August 16, 2012 11:58 AM |
| To: | Collyard, Michael A. (MACollyard@rkmc.com) |
| Cc: | David Lubben (dglubben@dcamplaw.com) |
| Subject: | FW: Oak Leaf Outdoors, Inc. v. Double Dragon International, Inc. |
| Attachments: | 2012-08-16 Letter to Cassidy and Lubben.PDF |

Mike

This is to acknowledge receipt of your letter advising DDI intends to sell "repossessed" and "diverted" product. The product was returned and rejected by Oak Leaf as defective and our position remains unchanged – any such action will result in claims against your client under theories previously stated. Also, the court denied DDI's Motion for Relief, essentially finding the product could not be sold due to my clients intellectual property rights and your clients action would be in violation of the court order denying the Motion. We intend to file an emergency Motion for Protective Order.

Tim Cassidy

**From:** Foster, Teresa M. [mailto:TMFoster@rkmc.com]
**Sent:** Thursday, August 16, 2012 10:49 AM
**To:** Tim Cassidy; David Lubben <dglubben@dcamplaw.com> (dglubben@dcamplaw.com)
**Cc:** Collyard, Michael A.; Strom, Joshua B.
**Subject:** Oak Leaf Outdoors, Inc. v. Double Dragon International, Inc.

Mr. Cassidy and Mr. Lubben,

Please see attached correspondence from Michael A. Collyard.

Teresa Foster
Legal Administrative Assistant
Robins, Kaplan, Miller & Ciresi L.L.P.
800 LaSalle Avenue | 2800 LaSalle Plaza | Minneapolis, MN 55402
Direct: 612.349.0861 | Fax: 612.339.4181
tmfoster@rkmc.com | www.rkmc.com

Information contained in this e-mail transmission may be privileged, confidential and covered by the Electronic Communications Privacy Act, 18 U.S.C. Sections 2510-2521.

If you are not the intended recipient, do not read, distribute, or reproduce this transmission.

If you have received this e-mail transmission in error, please notify us immediately of the error by return email and please delete the message from your system.

Pursuant to requirements related to practice before the U. S. Internal Revenue Service, any tax advice contained in this communication (including any attachments) is not intended to be used, and cannot be used, for purposes

1

# EXHIBIT E



US006547035B1

(12) **United States Patent**
D'Acquisto

(10) Patent No.: **US 6,547,035 B1**
(45) Date of Patent: **Apr. 15, 2003**

(54) **LADDER MODULE**

(76) Inventor: **Andrae T. D'Acquisto**, 3314 E. Grange, Cudahy, WI (US) 53110

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/315,436**

(22) Filed: **May 20, 1999**

(51) Int. Cl.$^7$ .............................. **E04G 3/00**; E06C 9/00

(52) **U.S. Cl.** ........................................ **182/100**; 182/93

(58) Field of Search ........................... 182/8, 9, 91, 93, 182/100, 133, 136, 187, 206, 214

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 3,149,695 | A | * | 9/1964 | Pianka et al. ................. 182/91 |
| 3,336,999 | A | | 8/1967 | McSwain |
| 3,995,714 | A | | 12/1976 | Brookes et al. |
| 4,132,288 | A | * | 1/1979 | Bingham ................... 182/91 X |
| 4,263,983 | A | * | 4/1981 | Norton ................... 182/100 X |
| 4,432,436 | A | * | 2/1984 | Suiter ................... 182/100 X |
| 4,467,890 | A | | 8/1984 | McCallum et al. |
| 4,620,610 | A | | 11/1986 | Southard |
| 4,726,317 | A | * | 2/1988 | Ritten et al. ............... 182/91 X |
| 4,844,207 | A | | 7/1989 | Andrews et al. |
| 5,014,640 | A | * | 5/1991 | Owen, Sr. ................. 182/91 X |
| 5,040,635 | A | * | 8/1991 | Strickland ................... 182/100 |
| 5,109,954 | A | | 5/1992 | Skyba |
| 5,388,664 | A | * | 2/1995 | Bator ........................ 182/100 |
| 5,655,623 | A | * | 8/1997 | Skyba ................... 182/100 X |
| 5,704,448 | A | * | 1/1998 | Jenkins, Jr. ................. 182/93 |
| 5,752,580 | A | * | 5/1998 | Jenkins, Jr. ................. 182/100 |
| 5,806,626 | A | * | 9/1998 | Jenkins, Jr. ................. 182/100 |

FOREIGN PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| FR | 1346424 | * | 11/1963 | ................... 182/8 |

OTHER PUBLICATIONS

Advertising insert from 1999 Trade Show Issue of *Inside Archery*, dated Jan. 1999.

* cited by examiner

*Primary Examiner*—Daniel P. Stodola
*Assistant Examiner*—Hugh B. Thompson
(74) *Attorney, Agent, or Firm*—Boyle Fredrickson Newholm Stein & Gratz S.C.

(57) **ABSTRACT**

A ladder module for use in climbing trees, hunting or other purposes. The module includes a support member having a pair of support brackets mounted at the top and bottom ends of the support member. The brackets are generally V-shaped and include a number of teeth on the interior surface of the bracket that engage the tree on which the module is placed to prevent the module from slipping on the tree. The brackets also include a rectangular slot in the center of the bracket that receives a support member from a second ladder module to form a convenient nested carrying arrangement for the ladder modules. The module also includes a releasable securing arrangement for securing the module about the tree. The arrangement comprises a belt having a buckle and a pair of straps removably engagable with a fastener mounted to the support member on the side of the support member opposite the support brackets. The configuration of the securing arrangement allows the belt to be selectively and releasably positioned on the support member to avoid any interference with the belt by limbs or branches extending from the tree. The module also comprises a number of steps rotatably mounted to the support member at the top, center, and bottom of the support member opposite the support brackets. Each step includes a pair of annular shoulders on either side of the step that are engagable with a stop disposed beneath the step, allowing the step to provide a stable, horizontal stepping surface when rotated to either side of the support member.

**19 Claims, 2 Drawing Sheets**





FIG. 1

FIG. 2



FIG. 4

FIG. 5

FIG. 3

FIG. 6

US 6,547,035 B1

1

# LADDER MODULE

## FIELD OF THE INVENTION

The present invention is related to ladders for outdoor use, and more specifically to modular ladders used for climbing trees.

## BACKGROUND OF THE INVENTION

In order to hunt wild game such as deer and bears, many hunters find it desirable to place themselves in an elevated position above the animal hunted to prevent detection of the hunter by the animal. To do so, many hunters utilize tree stands that position the hunter in a tree a number of feet above the ground, keeping the hunter out of the typical line of sight of the animal.

As these tree stands are designed to position the hunter in a tree a number of feet above the ground, the problem arises of how the hunter will be able to place both the tree stand and himself in the tree at sufficient distance above the ground. In most cases, an individual will use some type of ladder to reach the portion of the tree on which the tree stand is to be placed. To accommodate the needs of the individual utilizing the ladder, the ladders designed for this purpose should optimally be lightweight, durable,: and easily portable.

The simplest type of ladder that may be used for this purpose is a conventional stepladder, consisting of a pair of parallel rails separated by a number of steps or rungs attached between the rails. The stepladder can be leaned against or placed adjacent a selected tree to allow the individual to secure the hunting stand at the desired level on the tree. However, these conventional stepladders present certain problems when used for this purpose. Due to the size of most stepladders, they become unwieldy when transported into the normally confined environment of a forest where a tree stand is used. Also, the stepladder is not equipped with any type of safety device that reliably secures the stepladder to the tree. Without such a device, there is no way to prevent the ladder from inadvertently sliding off of the tree and injuring an individual using the ladder.

Other types of ladders have been specially designed for use in connection with hunting tree stands to overcome the problems associated with utilizing a conventional ladder. One type of ladder designed specifically for this purpose is disclosed in McSwain U.S. Pat. No. 3,336,999. This combination ladder and hunting stand includes a stand or platform upon which the hunter may sit while hunting, a ladder assembly extending downwardly from one side of the stand to support the stand above the ground, and a clamp mechanism attached beneath the stand opposite ladder assembly for securing the stand and ladder assembly to the trunk of a tree. The ladder assembly is comprised of a number of intermediate ladder sections that are detachable from one another, allowing the ladder assembly to be quickly taken down and placed into a compact, portable arrangement.

While this invention provides a ladder and hunting stand capable of being reliably secured to a tree trunk by the clamp mechanism, the ladder assembly forms a conventional stepladder-like arrangement when assembled. As such, the hunting stand still has problems similar to those associated with a conventional stepladder. For instance, the clamping mechanism will only properly grip the tree when the ladder assembly is placed at an angle commensurate with the tree trunk. When an irregularly shaped tree trunk is not close to perpendicular to the ground at the point at which the

2

clamping mechanism is attached to the tree, the ladder assembly is not able to be positioned perpendicularly to the ground to insure a stable base for the ladder assembly. Therefore, the assembly cannot be utilized with a tree having a trunk that is irregularly shaped. This necessarily limits the number of trees on which the hunting stand disclosed in McSwain may be used. Furthermore, as the ladder assembly is a single, unitary piece when constructed, any limbs or branches extending outwardly from the lower portion of the trunk may also create problems by contacting the assembly and preventing the proper stable positioning of the assembly adjacent the selected tree.

Other types of ladders have been developed for climbing trees that utilize a modular construction that allows the ladders to be utilized with trees having irregularly shaped trunks and/or branches extending from the trunk at a low level, conditions which make ladders having conventional stepladder arrangement unusable.

The individual modules, or climbing sticks, used in forming these ladders have a simple construction comprised of a number of individual alternating steps secured to an elongate tubular support member. The individual steps are pivotably mounted to the support member, allowing the steps to rotate from a closed, vertical position when the module is in transport or is not in use, to an open, horizontal position where the step points outward perpendicular to the support member to provide alternating stepping surfaces for the individual utilizing the module ladder.

Each module is secured to the tree trunk by a securing belt permanently attached at one end by a bolt to one side of the support member. The belt is releasably secured at its opposite end to a belt hook permanently attached to the support member opposite the belt.

The module is supported on the tree by a pair of stabilizing brackets located at the upper and lower ends of the support member. The brackets engage the trunk of the tree to prevent the ladder module from sliding downwardly along the trunk while supporting an individual. The brackets are rotatably mounted to each end of the support member to allow each bracket to independently conform to the direction in which the tree trunk extends.

However, these individual ladder modules still have certain shortcomings. First, the steps each have a stepping surface on only one side of the step. Therefore, in order to laterally position the step to expose the stepping surface, the step must be rotated in a specified direction relative to the support member to present the stepping surface. Due to the location of branches on the trunk of a tree, it may not be possible to rotate one or more of the steps on the support member in the required direction to properly expose the stepping surface as a branch may prevent the complete rotation of the step in that direction.

Similarly, when securing the ladder module to the tree, the permanent attachment of the securing belt at one end to the support member necessitates the securing of the belt to the support member around the tree trunk in only one direction. Again, due to the placement of branches on the trunk of the tree, it may not be possible to properly secure the securing belt around the tree trunk due to interference from the branches.

Lastly, the construction of the individual ladder modules, while being lightweight and allowing for easy transportation of each modules, does not include any convenient way for connecting individual modules together to form a convenient and portable nested ladder module arrangement.

## SUMMARY OF THE INVENTION

The present invention is an improved ladder module, or climbing stick, used by individuals to form a modular ladder

US 6,547,035 B1

**3**

for climbing a tree to position and/or reach a tree stand. The module is formed similarly to prior art ladder modules and comprises a set of steps rotatably connected to an elongate tubular support member. The steps have an arrowhead shape and are spaced from each other along the length of the support member to form an upper step, a middle step, and a lower step. Each step includes a grooved stepping surface disposed on both long sides of each step that allow the steps to provide a non-slip stepping surface when rotated to either side of the support member. Also, on both sides of the point of attachment of each step to the support member are located a pair of annular shoulders, capable of restricting the rotation of each step with respect to the support member. Each shoulder engages a stop located beneath the step to selectively position the step outwardly on either side of the support member. This improved step construction allows the ladder module of the present invention to be used in situations where prior art ladder modules could not be used by providing steps that may be rotated in either direction on the support member to avoid any limbs or branches that may obstruct the rotation of the step in one direction.

The improved ladder module also includes a pair of stabilizing brackets attached adjacent the upper and lower ends of the support member opposite the upper and lower steps. Each bracket includes a gripping surface having a number of teeth opposite the support member to engage the surface of a tree on which the ladder module is mounted. The brackets are also rotatably mounted to the support member, allowing the brackets to conform to the contours of an irregularly shaped tree trunk with which the brackets are engaged. Furthermore, the gripping surface on the brackets opposite the support member is milled to provide a slot into which support members from other ladder modules may be inserted in order to assemble a multitude of ladder modules in a nested module arrangement.

Another feature of the improved ladder module of the present invention is a securing arrangement attached to the support member used to secure the module to the tree. The arrangement includes a belt fastener disposed on the support member between the upper step and the middle step. The fastener is comprised of a stem extending outwardly from the support member and a radially extending flange attached to the stem opposite the support member that covers the stem. The flange provides an attachment point for a belt forming the remaining portion of the improved securing arrangement utilized with the ladder module. The belt is comprised of a pair of straps, each including a loop at one end. The loops on each strap are placed over the flange of the fastener to secure the loops to the fastener on the support member. One of the straps includes an adjustable buckle attached to the strap opposite the loop that engages the non-loop end of the remaining strap to releasably secure the belt about the trunk of the tree. The loop and fastener arrangement of the present invention allows the securing belt to be secured about the tree trunk with the buckle positioned on either side of the support member, so that the buckle may be selectively positioned to avoid any limbs, branches or other obstructions that may prevent the securing belt from performing properly. This securing arrangement is also able to be used on other devices utilized by hunters that are secured to a tree, such as tree stands.

The present invention is an improved ladder module that includes a plurality of steps rotatably mounted on a support member that are capable of rotating in either direction with respect to the support member to provide a grooved, non-slip stepping surface on either side of the support member.

The improved ladder module also includes an adjustable securing arrangement for releasably attaching the ladder

**4**

module to the tree trunk. The arrangement includes a fastener secured to the support member and a securing belt formed of a pair of straps releasably secured to the fastener. This arrangement enables an adjustable buckle located on one strap of the securing belt attached to the module to be placed on either side of the support member, enabling the buckle to be selectively positioned in order to avoid obstructions present on the tree trunk that would otherwise prevent the securing arrangement from functioning properly.

The improved ladder module further provides a milled slot in each of a pair of stabilizing brackets secured adjacent each end of the module that function to receive and retain the support member of a second ladder module to create a convenient nested carrying arrangement for a number of ladder modules.

BRIEF DESCRIPTION OF THE SEVERAL VIEWS OF THE DRAWING

In the drawings:

FIG. 1 is an isometric view illustrating the module ladder of the present invention attached to the trunk of a tree;

FIG. 2 is a front elevation view of the ladder module of FIG. 1;

FIG. 3 is a side elevation view of the ladder module of FIG. 1;

FIG. 4 is a partially broke[]n away front view of the top of the ladder module of FIG. 1;

FIG. 5 is a partially broken away rear view of the top of the ladder module of FIG. 1; and

FIG. 6 is a top view of the ladder module of FIG. 1.

DETAILED DESCRIPTION OF THE INVENTION

FIGS. 1–6 illustrate a ladder module **8** constructed according to the present invention. The module **8** is attached to a tree **10** for use in climbing the tree **10** in the manner illustrated in FIG. 1.

Referring now to FIG. 2, the module **8** includes an elongate support member **12** that functions as the body of module **8**. The support member **12** is an elongated square metal tube having a top end **13**, a bottom end **14**, and a pair of plastic end caps **16** disposed in the top end **13** and bottom end **14** of support member **12**. The end caps **16** prevent water and debris from entering into the interior of support member **12**.

The support member **12** also includes a number of steps **18** formed of a lightweight metal, preferably aluminum, that are spaced along one side of the support member **12**. Each step **18** is rotatably mounted to the support member **12** to provide a stepping surface for an individual using the ladder module **8**. Preferably, the steps **18** are mounted to the support member **12** near the top end **13**, bottom end **14** of the support member **12** and at the center of the support member **12**. As best shown in FIGS. 2 and 4, the steps **18** are generally triangular in shape having a pair of stepping portions **20** connected to each other at one end, forming a pointed end **22**, and to opposite ends of a connecting portion **24** opposite the pointed end **22**. This configuration allows each step **18** to provide a stepping surface on each stepping portion **20** when the step **18** is rotated to one side of the support member **12**. To aid an individual using the steps **18** on support member **12** to climb the tree **10**, each stepping portion **20** includes a number of grooves **34** spaced along its length. The grooves **34** provide traction for the foot of the individual utilizing the step **18** to help prevent the foot from

US 6,547,035 B1

5

slipping off the stepping portion 20 of the step 18. Each step 18 also has a generally open interior 26 between the stepping portions 20 and connecting portion 24 to reduce the weight of each step 18.

Each step 18 is rotatably connected to the support member 12 by a bolt 28 inserted through an opening 29 in the center of the connecting portion 24. The bolt 28 extends through an aligned opening 30 passing through support member 12 and is secured therein by a nut 31 threadably mounted onto the bolt 28 on the side of support member 12 opposite the step 18. To facilitate the movement of each step 18 with respect to the support member 12, a washer 32 formed of a low friction material is preferably disposed between the step 18 and support member 12 around bolt 28.

Each step 18 also includes a pair of curved shoulders 36 disposed in opposite ends of connecting portion 24, as best shown in FIG. 4. When the step 18 is rotated in either direction on support member 12, one of the annular shoulders 36 contacts a stop 38 positioned directly beneath the step 18 on support member 12. Each annular shoulder 36 engages the stop 38 to laterally position the step 18 such that each stepping portion 20 provides a horizontal stepping surface on one side of the support member 12, depending upon the side of support member 12 to which the step 18 has been rotated. The stop 38 is generally formed by the head of a bolt 37 extending through the support member 12 and secured thereto by a nut 40 attached to the bolt 37 on the side of support member 12 opposite the step 18.

Referring now to FIGS. 5 and 6, the support member 12 also includes a pair of support brackets 42 mounted adjacent the top end 13 and bottom end 14 of the support member 12. As best shown in FIG. 6, the brackets 42 are generally V-shaped, including an interior surface 44 and an exterior surface 46. The interior surface 44 of bracket 42 includes a rectangular slot 48 in the center of bracket 42 that has a pair of ridges 49 extending upwardly from the bottom of the slot 48. The slot 48 and ridges 49 are sized to receive the support member 12 of a second ladder module 8 to compactly position the separate modules 8 to form a convenient nested carrying arrangement for the modules 8.

On either side of the slot 48, the interior surface 44 also includes a number of teeth 50 spaced along the length of each side of bracket 42. The teeth 50 are generally triangular in shape having a point 52 extending outwardly from the interior surface 44 of bracket 42. The teeth 50 on bracket 42 engage the trunk of the tree 10 to prevent the module 8 from sliding down the tree 10 when a person is climbing a tree 10 utilizing the module 8.

Looking now at FIGS. 2, 3 and 6, each bracket 42 is secured to the support member 12 opposite the steps 18 located near the top end 13 and bottom end 14 of support member 12. The bolts 28 utilized to secure these steps 18 to the support member 12 are also used to secure the brackets 42 to the support member 12. Each bolt 28 extends through an opening 54 in the center of slot 48 in bracket 42 and is secured therein by the nut 31 which is threaded onto the end of bolt 28 protruding into the slot 48. The bolt 28 and nut 31 attaching the bracket 42 to support member 12 are prevented from contacting the second support member 12 of the second module 8 inserted into slot 48 by the ridges 49 which extend above the level of the bolt 28 and nut 31.

In a manner similar to the steps 18, each bracket 42 is also capable of rotating with respect to the support member 12, as shown in FIG. 5. A washer 56 similar to the washer 32 utilized in connection with each step 18 is positioned between the bracket 42 and the support member 12 to

6

facilitate the rotation of the bracket 42 with respect to the support member 12. The rotation of each bracket 42 is restricted in a manner similar to that for each step 18 using the stops 38 located at the top 13 and bottom 14 of support member 12. The nuts 40 securing the stops 38 within support member 12 restrict the rotation of each bracket 42 by contacting each bracket 42 in the same way as the stops 38 contact the shoulders 36 of the steps 18.

Referring now to FIGS. 1–3, the support member 12 also has a securing arrangement 57 used to hold the module 8 on the tree 10. The arrangement 57 is attached to the support member 12 and includes a belt fastener 58 and a securing belt 70. The fastener 58 is secured to the support member 12 between the steps 18 positioned at the top end 13 of support member 12 and at the center of the support member 12. The fastener 58 includes a cylindrical mounting sleeve 60 extending outwardly from the support member 12 and a circular retaining flange 62 positioned on the mounting sleeve 60 opposite the support member 12. The flange 62 is preferably a metal washer having a diameter significantly greater than the sleeve 60 and including a hole 64 in the center of the flange 62. The sleeve 60 and flange 62 are secured to the support member 12 by a bolt 66 inserted into the support member 12 through the hole 64 in flange 62 and through sleeve 60. The bolt 66 extends through the support member 12 and is secured to the support member 12 opposite the fastener 58 by a nut 68. The fastener 58 provides a point on the support member 12 used to removably attach each end of a securing belt 70 to the support member 12 in order to reliably secure the module 8 to the tree 10, as shown in FIG. 1.

The belt 70 is comprised of a securing strap 72, a buckle strap 74, and a releasable buckle 76. The securing strap 72 is an elongate strap of a durable material, such as nylon, that includes a free end 78 and a loop 80 integrally formed in the strap 72 opposite the free end 78. The securing strap 72 is removably attached to the fastener 58 by placing the loop 80 around the retaining flange 62 of fastener 58. The flange 62 prevents the loop 80 from disengaging from the fastener 58, maintaining the securing strap 72 in attachment, with the support member 12.

The buckle strap 74 is formed of the same material as the securing strap 72 and also includes a loop 82 at one end that is also removably attached to the fastener 58. However, the end of buckle strap 74 opposite the loop 82 is attached to the buckle 76, which is placed around the tree to receive the free end 78 of securing strap 72 to secure the ladder module 8 on the tree 10.

To attach the module 8 to a selected tree 10, first, the securing strap 72 and buckle strap 74 are secured to the fastener 58 on support member 14 so that the securing arrangement 57 and, namely, the buckle 76 on buckle strap 74, will not be obstructed by any limbs extending from the tree 10. Next, the brackets 42 are positioned against the center of the tree 10 to position the support member 12 in a generally vertical direction on the tree 10. The brackets 42 may be rotated with respect to the support member 12 to conform to the shape of the tree 10. Then, the straps 72 and 74 of the securing belt 70 are wrapped around the tree 10 in opposite directions, and the free end 78 of securing strap 72 is inserted through the buckle 76. The securing strap 72 is pulled tight through buckle 76 to securely fasten the securing belt 70 about the tree 10. Finally, each step 18 is rotated with respect to support member 12 to extend one of the stepping portions 20 on step 18 to provide a horizontal stepping surface where desired on one side of the support member 12.

US 6,547,035 B1

7

I claim:

**1**. A ladder releasably securable to a tree, the ladder comprising:

a) an elongate support member having a top end and a bottom end;

b) at least two stabilizing brackets mounted to the support member;

c) at least two steps mounted to the support member opposite the at least two brackets;

d) at least two stops positioned on the support member adjacent the at least two brackets and the at least two steps; and

e) at least two fasteners, a respective one inserted through a respective one of the at least two steps, the support member and the at least two brackets.

**2**. The ladder of claim **1** wherein the at least two steps are rotatable about the at least two fasteners with respect to the support member.

**3**. The ladder of claim **2** wherein the at least two steps each include a fastener opening through which each of the at least two fasteners is inserted, and a pair of stopping surfaces disposed on either side of the fastener opening and engageable with each of the at least two stops.

**4**. The ladder of claim **3** wherein the at least two steps are positioned in a first direction to generally perpendicular to the support member when one stopping surface is engaged with one of the at least two stops.

**5**. The ladder of claim **4** wherein the at least two steps are positioned in a second direction generally perpendicular to the support member and opposite the first direction when the other stopping surface is engaged with one of the at least two stops.

**6**. The ladder of claim **1** wherein the at least two brackets are rotatable about each of the at least two fasteners with respect to the support member.

**7**. The ladder of claim **6** wherein the rotation of each of the at least two brackets with respect to the support member is limited by one of the at least two stops.

**8**. The ladder of claim **6** wherein the at least two steps are rotatable about each of the at least two fasteners with respect to the support member.

**9**. The ladder of claim **1** further comprising:

a) an upper stabilizing bracket mounted to the support member adjacent the upper end;

b) an upper step mounted to the support member opposite the upper bracket;

c) an upper fastener mounted to the support member and to the upper step and the upper stabilizing bracket;

d) a lower stabilizing bracket mounted to the support member adjacent the lower end;

e) a lower step mounted to the support member opposite the lower bracket; and

f) a lower fastener mounted to the support member and to the lower step and the stabilizing bracket.

**10**. The ladder of claim **1** wherein the upper and lower stabilizing brackets include a central portion positioned adjacent the support member and having an inner dimension slightly larger than the outer dimension of the support member, wherein the central portion is adapted to receive and engage a second support member of a second ladder.

**11**. The ladder of claim **10** wherein the central portion is generally U-shaped.

**12**. The ladder of claim **1** further comprising a securing member fixed to the support member and spaced from the at least one fastener.

8

**13**. The ladder of claim **12** wherein the securing member includes:

a) a hollow stem positioned generally perpendicularly against the support member;

b) a flange positioned on the stem opposite the support member; and

c) a connector inserted through the flange and the stem and engaged with the support member to hold the flange and stem on the support member.

**14**. The ladder of claim **12** further comprising:

a) a holding strap having a first loop at one end that is releasably engageable with the securing member and a releasable buckle attached to the opposite end; and

b) a securing strap having a second loop at one end that is releasably engageable with the securing member and a free end opposite the loop that is releasably engageable with the buckle.

**15**. A ladder releasably securable to a tree, the ladder comprising:

a) an elongate support member having a number of exterior surfaces;

b) a fastener inserted through and projecting outwardly from opposed exterior surfaces of the elongate support member;

c) a stop inserted through and projecting outwardly from opposed exterior surfaces of the support member beneath the fastener and in the same direction as the fastener; and

d) a step rotatably mounted to the fastener on the support member against only one of the number of exterior surfaces and having first and second opposed stop surfaces engageable with the stop, wherein the step is movable between a first position where the first stop surface engages the stop and the step is positioned generally perpendicular to the one exterior surface of the support member, the second position where the step is positioned generally parallel to the support member, and a third position wherein the second stop surface engages the stop and the step is positioned generally perpendicular to the one exterior surface of the support member and opposite the first position.

**16**. The ladder of claim **15** further comprising a stabilizing bracket rotatably mounted to the support member and spaced from the step.

**17**. The ladder of claim **16** wherein the stabilizing bracket is mounted to the fastener opposite the step.

**18**. A ladder releasably securable to a tree, the ladder comprising:

a) an elongate support member having a number of exterior surfaces;

b) a fastener inserted through and extending outwardly from opposed exterior surfaces of the support member;

c) a stop inserted through and extending outwardly from opposed exterior surfaces of the support member adjacent the fastener;

d) a step rotatably secured to either the fastener or the stop on the support member against only one of the number of exterior surfaces, the step having first and second opposed stop surfaces engageable with the stop, wherein the step is movable between a first position where the first stop surface engages the stop and the step is positioned generally perpendicular to the one exterior surface of the support member, a second position where the first and second opposed stop surfaces are spaced from the stop and the step is positioned

US 6,547,035 B1

9

generally parallel to the one exterior surface of the support member, and a third position where the second stop surface engages the stop and the step is positioned generally perpendicular to the one exterior surface of the support member and opposite the first position; and

c) a stabilizing bracket rotatably secured to one end of either the fastener or the stop on another of the number of exterior surfaces opposite the step.

**19**. A ladder releasably securable to a tree, the ladder comprising:

a) an elongate support member having a number of exterior surfaces;

b) a first fastener inserted through and extending outwardly from opposed exterior surfaces of the support member;

c) a stop inserted through and extending outwardly from opposed exterior surfaces of the support member adjacent the first fastener;

d) a step rotatably secured to the first fastener on the support member against only one of the number of

10

exterior surfaces, the step having first and second opposed stop surfaces engageable with the stop, wherein the step is movable between a first position where the first stop surface engages the stop and the step is positioned generally perpendicular to the one exterior surface of the support member, the second position where the step is positioned generally parallel to the one exterior surface of the support member, and a third position wherein the second stop surface engages the stop and the step is positioned generally perpendicular to the one exterior surface of the support member and opposite the first position;

e) a second fastener spaced from the stop and inserted through and extending outwardly from opposed exterior surfaces of the support member; and

f) a stabilizing bracket mounted to the second fastener on another of the number of the exterior surfaces opposite the step.

* * * * *

# EXHIBIT F



US007371442B2

(12) **United States Patent**     (10) Patent No.:   **US 7,371,442 B2**

Pitman     (45) Date of Patent:   **May 13, 2008**

(54) **ARTIFICIAL FOLIAGE**

(76) Inventor: **David B. Pitman**, P.O. Box 902, Lomax, IL (US) 61454

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 82 days.

(21) Appl. No.: **10/888,475**

(22) Filed: **Jul. 12, 2004**

(65)     **Prior Publication Data**

US 2006/0008598 A1    Jan. 12, 2006

(51) **Int. Cl.**
*A41G 1/00*     (2006.01)

(52) **U.S. Cl.** ........................... **428/23**; 428/17; 428/27; 428/919; 135/901

(58) **Field of Classification Search** ................. 428/17, 428/23, 24, 919, 27; 135/901; 43/1
See application file for complete search history.

(56)     **References Cited**

U.S. PATENT DOCUMENTS

1,150,027 A    8/1915   Gates

| | | | | |
|---|---|---|---|---|
| 4,215,163 A | 7/1980 | Lee | | |
| 5,221,565 A | 6/1993 | Johnson | | |
| 5,320,884 A | 6/1994 | Tai | | |
| 5,395,664 A | 3/1995 | Thompson | | |
| 5,759,645 A | 6/1998 | Li | | |
| 6,037,021 A | * | 3/2000 | Koo | ........................... 428/10 |
| 6,093,459 A | * | 7/2000 | Puleo, Jr. | .................... 428/20 |
| 6,306,471 B1 | * | 10/2001 | Pitman et al. | ................. 428/18 |

FOREIGN PATENT DOCUMENTS

JP     2001132273 A   *   5/2001

* cited by examiner

*Primary Examiner*—John J. Zimmeraman
*Assistant Examiner*—Aaron Austin
(74) *Attorney, Agent, or Firm*—Joseph W. Holloway

(57)     **ABSTRACT**

An artificial foliage structure with wire cores embedded in its leafy parts causing these parts to "spring back" upon removal of compressive loading acting thereupon. These wire cores may be made of hard, springy steel such as piano wire or small diameter spring wire. Thicker, woody limbs and branches have embedded therein heavier wire cores that are sufficiently soft to be given a set solely by manually applied bending force.

1 Claim, 2 Drawing Sheets





Fig.1

Fig. 7

Fig.6

Fig.5

Fig.2

Fig.3

Fig.4



Fig.8

Fig.9

1

# ARTIFICIAL FOLIAGE

## BACKGROUND OF THE INVENTION

This invention relates to a naturally appearing artificial foliage assembly comprising limbs, branches, stems and leaves. The foliar elements disclosed herein represent certain improvements over those of the arborescent concealment artifice previously disclosed in U.S. Pat. No. 6,306,471 issued to D. B. Pitman, the present inventor.

Pitman assembles artificial foliar components such as limbs, branches, stems and leaves by means of a unitarily molded plastic encasement or sheath. According to Pitman, his components have discrete reinforcing wire core portions which are joined by molding his plastic sheath thereabout. Pitman envisions a life-like foliar structure which a user can draw in about himself by plastically bending the skeletal wire framework carrying his foliar components. To facilitate ready bending of the framework for concealment and for reverse bending to a restored condition, Pitman suggests these characteristics and properties for a suitable skeletal wire framework: "The diameter and length of a particular wire segment depends on which woody part of the foliage will contain that wire segment. For example, the longer, stiffer limbs have encapsulated therein the longest and heaviest wire segments while the wire forming the flexible leaf stems are relatively short and lightweight. All of the skeletal wire segments comprise a malleable mild steel which, when covered with the aforesaid flexible sheath, afford the woody parts of the foliage structure a semi-rigid nature and a degree of life-like flexibility. It is important that the skeletal wire core be plastically deformable, i.e. bendable at the location desired and to a degree desired by no more than moderate manual force. It should be understood that the wire cores molded in all parts of the foliar structure must provide sufficient strength to prevent these parts from slumping under their own weight or from bending or breaking in windy conditions . . . . The longer, stiffer links may contain wire cores up to six feet or more in length and three sixteenths of an inch in diameter while the wire diameters of the shorter, more pliable branches and stems are much less."

That Pitman positively requires that the core wires of all parts of his foliar structure be deformable by manual bending is clear from his specification which recites, inter alia, "After the limbs are secured to a support, such as a tree trunk . . . , the plastically deformable limbs, branches and leaf stems are bent by the user to accomplish his obscuration. Should the user choose to position himself in front of the structure, the limbs can be bent forwardly and then inwardly to enclose the user entirely within the artificial foliage of the surrounding structure. Thereafter, the user may bend individual branches and leaf stems to enhance the illusion of a naturally foliaged tree or bush having as desired size, array, opacity and coloration . . . . By shaping easily bendable branches, branchlets and leaves, an observation or shooting port of a desirable size and shape can be fashioned as needed and later closed if desired. The density of the simulated foliage, hence its opacity, need not be uniform but can be increased or decreased by bending and layering or overlapping the branches and leaves in selected areas of the overall array."

Pitman's concealment structure is well suited to achieve the objectives recited in his patent and has enjoyed considerable commercial success; however, first hand field experience has demonstrated a need to reduce dramatically the time and effort expended by a user in erecting and adjusting the structure prior to use.

2

Initially, one or more main supporting limbs, along with its appended branches, stems and leaves, are bunched together to permit their being fitted inside boxes or bags in which they are initially sold. Likewise, after the structure has been employed in the field, the stems and leaves previously arrayed by the user are manually gathered and forcibly collapsed into an elongated bundle for easier transportation and storage. Such compaction of the relatively inelastic wire cores of the stem and leaf portions of the wire framework causes them to take on a set condition which will not likely meet the user's needs upon subsequent redeployment of the structure. Therefore, time-consuming and tedious manual straightening and/or rebending of stem and leaf portions of the structure can be expected. Alleviation of this drawback displayed by the Pitman structure is the principal objective of the present invention.

While the inventor is aware of the several prior art patents which are somewhat related to the present invention in that each discloses an artificial foliage assembly having an encased metallic core, none recognizes the same problem and none suggests a solution for this problem. In this regard, please refer to U.S. Pat. No. 1,150,027 issued Aug. 17, 1915 to Gates; U.S. Pat. No. 4,215,163 issued Jul. 29, 1980 to Lee; U.S. Pat. No. 5,221,565 issued Jun. 22, 1993 to Johnson; U.S. Pat. No. 5,320,884 issued Jun. 14, 1994 to Tai et al; U.S. Pat. No. 5,395,664 issued Mar. 7, 1995 to Thompson; and, U.S. Pat. No. 5,759,645 issued Jun. 2, 1998 to Li.

## SUMMARY OF THE INVENTION

This invention has as its principal objective the provision of an artificial foliar structure which can be set up for use more readily than similar devices heretofore known. To this end, the present invention proposes that certain of the wire components which collectively form the interior framework of an artificial foliar structure vary not only in length and diameter, for the aforestated reasons, but that they also differ in strength and hardness.

Another object is to provide a simulated plastic leaf molded about a springy wire segment which extends generally along its centerline. Such wire segment will have a sufficient degree of elasticity to cause it and the leaf to spring back to its original shape and orientation when a deflecting load is removed.

Yet another object is to provide artificial foliage components molded about plural-part cores made up of wire segments having differing resistances to bending and differing elasticities. Thus, the wires encased in large limbs and major branches projecting therefrom are characterized by sufficient ductility and elasticity to allow the user to shape and orient them by giving them a set quickly and with minimal effort. On the other hand, those supporting cores molded inside small branchlets and leaves attached thereto are more lightly constructed, i.e. of smaller diameter, but are made of metal having greater hardness, stiffness and elasticity than do the softer core wires imbedded in the larger, heavier limbs and branches. The principal advantage provided by such differing characteristics of the various core wires is that the cores of the branchlets and myriad leaves of a foliar structure can avoid plastic deformation as the structure is collapsed and, at the same time, store sufficient elastic energy to cause the branchlets and leaves to return to their previous shapes and orientations with little or no user assistance.

A more specific object is to provide a unitary, artificial foliage structure having imbedded springy cores which

US 7,371,442 B2

3

affords its leafy portions a "snap back" characteristic. To this end, the structure's supporting wire framework is fabricated by positioning wire segments of progressivly smaller diameter and length in the cavity of a typical injection mold then injecting a suitable plastic material to join the wire segments thereby providing a semi-rigid sheath about the embedded wires. Preferably, the smallest diameter wires molded in the terminal branchlets and leaves are made of hard, springy metal such as piano wire, spring wire or the like.

These and other desirable features and objects of this invention and the manner of obtaining them will become apparent and the invention will be more fully understood by having reference to the following detailed description of the invention taken in conjunction with the accompanying drawings.

DESCRIPTION OF THE DRAWINGS

FIG. 1 is a partial elevational view showing a portion of an artificial foliage structure including a central branch, side branches, branchlets and leaves.

FIG. 2 is an enlarged cross sectional view taken along lines 2-2 of FIG. 1.

FIG. 3 is a view similar to FIG. 2 taken along lines 3-3 of FIG. 1.

FIG. 4, is a view similar to FIG. 2 taken along lines 4-4 of FIG. 1;

FIG. 5, is a view similar to FIG. 2 taken along lines 5-5 of FIG. 1;

FIG. 6, is a view similar to FIG. 2 taken along lines 6-6 of FIG. 1;

FIG. 7, is a view similar to FIG. 2 taken along lines 7-7 of FIG. 1;

FIG. 8, is a plan view of one of the leaves depicted in FIG. 1 which shows by a central broken away surface portion and by broken lines the cores encased in the leaf and leaf stem; and,

FIG. 9 is an enlarged cross section taken along lines 9-9 of FIG. 8.

DETAILED DESCRIPTION OF THE INVENTION

An artificial foliage structure, designated in its entirety by numeral 10 in FIG. 1 of the drawings, may be fabricated using a previously known method whereby overlapping end segments of metallic wires are laid side by side in an elongated cavity of an injection mold of suitable size and shape. After the cavity is filled with plastic material which is allowed to harden, the wire segments will be held in position within a resulting semi-rigid casing. As will be fully described hereinafter, the individual wire segments comprise a composite interior framework for the foliage structure which secures the constituent foliar parts together, more or less as shown in FIG. 1, while permitting a degree of flexibility of the individual parts.

FIG. 1 is illustrative of one of the many different foliar structures that can be fabricated using the molding method suggested above. Commonly, such structures include a central limb 12 which supports laterally extending main branches 14 that carry branchlets 16 having attached stems 18 and leaves 20. The central, heavier limb 12 which may be of any desired length, may have its proximal end removably supported and retained in a socket or like receptacle, not shown. While only three main branches 14 have been shown, the limb 12, if made longer than shown in FIG. 1, may have additional side branches extending therefrom each

4

carrying its own array of branchlets, stems and leaves. As shown in FIGS. 2 through 7, the cross sections of the molded artificial limbs, branches, branchlets and stems decrease generally in the same manner as do those of natural tree structures. The plastic material employed to mold the casing 22 is a matter of choice providing only that its displays good molding characteristics, is durable in outdoor environments, and is suitably strong yet flexible to permit a desired degree of flexing and bending without fracturing. The cross sectional thickness of the casing 22 about the skeletal wire core may be nonuniform to give the wood parts of the foliar components a natural appearance and the sheath's surface may be embossed to have a roughened or bark-like surface.

The limb portion 12 of the tree spray structure 10 may be of any length dictated by the intended use of the structure. In the illustrative embodiment of the invention depicted in FIG. 1, the length of limb 12 is on the order of 75 cm; the main branches 14 are about 25 cm; the branchlets 16 vary from 5 cm to 10 cm in length; and, the leaf stems 18 are about 5 cm in length. It will be understood that the length of the various components of the foliar structure as well as the spacing and location of points of attachment for their proximal ends will be determined by the species of foliage that is to be artificially reproduced.

The skeletal core of the foliage structure 10 comprises an assemblage of wire segments of variable lengths and cross sectional diameters. The cross sectional views in the accompanying drawings show that the embedded wire segments providing the skeletal core of the structure 10 vary considerably in diameter. For example, the wire 24 encased in limb 12 has a diameter of 3.2 mm; the core wires 26 encased in side branches 14 have a diameter of 1.4 mm; the branchlet wires 28 have a diameter 1.0 mm; and the wires 30 running through and encased in leaf stems 18 and leaves 20 have a diameter of 0.5 mm.

FIGS. 8 and 9 depict a detached leaf stem 18 and leaf 20 illustrative of the several leaves shown in FIG. 1. The core wires 30 are embedded in or jacketed by the leaves and stems, respectively, as an incident to the unitary molding of the foliar structure 10. The wires 30 are juxtaposed, as shown in FIG. 8, and overlap substantially. A leaf core wire 30 extends medially through the leaf 20 so that its distal end of wire 21 closely approaches the distal end of leaf 20.

The various core wire lengths and wire diameters of this invention are similar to those disclosed in the previously referenced U.S. Pat. No. 6,306,471; however, an essential difference between the present invention and the Pitman structure resides in the material specifications for the wire core segments molded into various parts of the foliar structure.

From the above set forth portions of the Pitman specification, it will be understood that his entire skeletal core is fabricated of "suitably malleable mild steel wire" which is "easily bendable". Thus all of Pitman's core wires, including those embedded in his stems and leaves, are required to be easily bendable to accomplish maximum obscuration of a user enclosed within an artificial foliage. According to Pitman, this characteristic of the larger diameter cores is desirable in order to permit ready manual bending. However, it has been observed that the ease with which the lighter, thinner cores of his leaf stems can be plastically deformed and shaped creates the aforenoted problems attending set up of the foliage and detracts significantly from the operational efficiency of the Pitman concealment artifice.

In accordance with this invention and in contradistinction to Pitman, the hardness and stiffness of the encased core wires within the various parts of the structure are nonuni-

US 7,371,442 B2

5

form. The preferred material for the limb and branch core wires **24** and **26** is a malleable, mild steel which will facilitate plastic deformation of these wires by the user during set up and collapse of the structure. On the other hand, the material comprising the branchlet, leaf stem and leaf cores **16**, **18** and **20**, respectively should display a degree of springiness commonly found in music wire or spring steel wire, for example.

Extensive testing of the effectiveness of various core wire materials to achieve a desired "spring back" or "pop up" type of restoration of the leaf stems **18** and leaves **20** following substantial and repeated compaction of the foliar structure has demonstrated that the following wire characteristics produce superior results:

Material: High carbon alloy steel—nominal analysis C 0.70 to 1.00%, Mn 0.20 to 0.60%

Fabricated by: Cold drawing

Diameter: 0.4 mm to 0.6 mm

Ultimate Tensile Strength (U.T.S.)—1500 to 2500 Mpa

For the above-specified wire diameters, the specified range of U.T.S, which reflects the hardness of the wire, is critical to obtaining and maintaining the desired springiness in the stems and leaves. If the wire's hardness is above the upper limit of the specified range of U.T.S., the leaf stems

6

and leaves are too inelastic and brittle to withstand repeated compaction. If the hardness of these light wires is less than that specified above, the stems and leaves are likely to be bent, folded and twisted by the compressive forces created by collapsing the foliar structure. When such plastic deformation results, time consuming and tedious manual manipulation of the stems **18** and leaves **20** can be expected the next time the structure is deployed.

It will be understood that variations in the specific construction, arrangement, materials, method of molding and end use of the herein disclosed foliar structure can be made without departing from the scope and spirit of the appended claims.

I claim as my invention:

**1**. A naturally appearing artificial foliage structure including woody and leafy constituant parts made of plastic material encasing therein a skeletal framework of embedded steel wires, wherein:

the hardness of the wires embedded in the leafy parts exceeds the hardness of the wires embedded in the woody parts.

* * * * *